UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| VIRGINIA FARLEY, individually and on behalf of all other similarly situated individuals, | COLLECTIVE AND CLASS ACTION |
| Plaintiff, | No.: |
| v. | **COMPLAINT** |
| ADECCO USA, INC. and RESTAURANT REVOLUTION TECHNOLOGIES, INC., jointly and severally, | **JURY DEMAND** |
| Defendants. | |

Plaintiff VIRGINIA FARLEY, individually and on behalf of all others similarly situated, by and through her attorneys, hereby brings this Collective and Class Action Complaint against Defendants ADECCO USA, INC. and RESTAURANT REVOLUTION TECHNOLOGIES, INC., and states as follows:

## INTRODUCTION

1.      This is a collective and class action brought pursuant to 29 U.S.C. § 216(b) and Fed. R. Civ. P. 23 by Plaintiff VIRGINIA FARLEY ("Plaintiff"), individually and on behalf of all similarly situated persons employed by Defendants ADECCO USA, INC. and RESTAURANT REVOLUTION TECHNOLOGIES, INC. ("Defendants"), arising from Defendants' willful violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*., among other laws.

2.      Defendant ADECCO USA, INC. ("Adecco") provides permanent and temporary staffing to companies throughout the United States.

COLLECTIVE CLASS ACTION COMPLAINT AND JURY DEMAND
Page 1 of 40

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

3.     Defendant RESTAURANT REVOLUTION TECHNOLOGIES, INC. ("RRT") operates a restaurant specific call center that specializes in answering telephone takeout and corporate catering orders.

4.     Adecco directly employed Plaintiff and assigned her to work for RRT.

5.     RRT jointly employed Plaintiff as a non-exempt hourly call center employee, or Virtual Server.

6.     Virtual Servers work from home via a remote virtual private network (VPN).

7.     The U.S. Department of Labor ("DOL") recognizes that call center jobs, like those held by RRT's Virtual Servers, are homogenous; in July 2008, it issued Fact Sheet #64 to alert call center employees to some of the abuses that are prevalent in the industry. (***Exhibit 1***, DOL Fact Sheet #64.)

8.     One of those abuses, which is at issue in this case, is the employer's refusal to pay for work "from the beginning of the first principal activity of the workday to the end of the last principal activity of the workday." (*Id*.) More specifically, DOL Fact Sheet #64 condemns an employer's non-payment of an employee's necessary pre-shift activities: "An example of the first principal activity of the day for agents/specialists/representatives working in call centers includes starting the computer to download work instructions, computer applications and work-related emails." (*Id.*) Additionally, the FLSA requires that "[a] daily and weekly record of all hours worked, including time spent in pre-shift and post-shift job-related activities, must be kept." (*Id*.)

9.     Defendants require Virtual Servers to work a full-time schedule, plus overtime. However, Defendants do not compensate Virtual Servers for all work performed; instead, Defendants only pay Virtual Servers *after* they have loaded several essential software programs on their computers and are available to accept calls. This uniform policy results in Virtual Servers not being paid for all time worked, including overtime.

10.     In addition, Defendants require Virtual Servers to perform off-the-clock work during their shifts when they encounter technical difficulties with RRT's software programs and applications and at the end of their shifts when they are required to shut down and log-out of the essential computer software used to perform their jobs.

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

11.     Virtual Servers use multiple computer programs, software programs and applications in the course of performing their responsibilities. These programs and applications are an integral, indispensable and important part of Virtual Servers' work, and they cannot perform their jobs effectively without them.

12.     Virtual Servers perform the same basic job duties and are required to use the same or similar computer programs, software programs, applications and phone systems.

13.     The individuals Plaintiff seeks to represent in this action are current and former Virtual Servers that worked for Defendants remotely and are similarly situated to each other in terms of their common experience of Defendants' violations of federal and state wage and hour law.

14.     Defendants knew or could have easily determined how long it takes Virtual Servers to perform their off-the-clock work and could have properly compensated Plaintiff and the putative Collective and Class for this work, but did not.

15.     Plaintiff seeks a declaration that her rights and the rights of the putative Collective and Class were violated, an award of unpaid wages, an award of liquidated damages, injunctive and declaratory relief, attendant penalties, and an award of attorneys' fees and costs to make her and all other Virtual Servers whole for damages they suffered, and to ensure that they and future workers are not subjected by Defendants to such illegal conduct in the future.

## JURISDICTION

16.     This Court has subject matter jurisdiction over Plaintiff's FLSA claim pursuant to 28 U.S.C. § 1331 because it raises a federal question under 29 U.S.C. § 201, *et seq.* Additionally, this Court has jurisdiction over Plaintiff's FLSA claim pursuant to 29 U.S.C. § 216(b), which provides that suit under the FLSA "may be maintained against any employer … in any Federal or State court of competent jurisdiction."

17.     Defendants' annual sales exceed $500,000, and they have more than two employees; thus, the FLSA applies in this case on an enterprise basis. Defendants' employees—including Plaintiff—engage in interstate commerce or in the production of goods for commerce; therefore, they are also covered by the FLSA on an individual basis.

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

18.     This Court has personal jurisdiction over RRT because it maintains its principal place of business in the State of Washington. In addition, if a customer asks a Virtual Server where he or she is located, Virtual Servers were expressly instructed and trained by RRT to respond, "We are based out of Bellevue Washington."

19.     Personal jurisdiction applies to Adecco because it conducts business within the State of Washington, employs individuals within the State of Washington, is registered with the Washington Secretary of State, maintains a physical presence in Washington, and holds itself out to the public as "the top Seattle staffing agency" and "one of the leading temp agencies in Seattle." (https://www.adeccousa.com/locations/seattle-washington-staffing-agencies/ (last visited July 27, 2018).) In addition, Adecco entered into (or engaged in activities pursuant to) a contractual relationship within this State to assign Virtual Servers to RRT, thereby creating a vertical joint employment relationship with RRT with respect to Plaintiff and all other Virtual Servers. Thus, Adecco has purposefully availed itself of the privileges of conducting activities in the state of Washington and has established minimum contacts sufficient to confer jurisdiction; the assumption of jurisdiction over Adecco will not offend traditional notions of fair play and substantial justice and is consistent with the Constitutional requirements of due process.

## VENUE

20.     Venue is proper in the Western District of Washington because Defendants employ individuals in this district, a substantial portion of the events forming the basis of this suit (including implementation of the illegal pay practices alleged in this litigation) occurred in this district, Defendants maintain a physical presence in this district, and RRT maintains its principal place of business in this district.

## PARTIES

21.     Plaintiff VIRGINIA FARLEY is a resident of Orlando, Florida and has been employed by Adecco since November 2016 and jointly employed by RRT as a Virtual Server since the same date. Defendants compensate Plaintiff through the payment of an hourly wage, most recently at the rate of $10.00 per hour. Plaintiff signed a consent form to join this collective action lawsuit. (***Exhibit 2***, Farley

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

Consent to Join.)

22.    Defendant RESTAURANT REVOLUTION TECHNOLOGIES is a Delaware corporation (File Number: 4971832) with its headquarters in Bellevue, Washington. RRT is licensed to do business in the State of Washington (UBI # 604 217 653), and its registered agent for service of process in Washington is Michael Dicks, 10400 NE 4th Street, Suite 500, Bellevue, Washington 98004.

23.    RRT refers to itself as the off-premise partner for restaurants. (*See, generally,* https://rrtusa.com/ (last visited on July 31, 2018).) According to its website, RRT is "an off-site ordering service that restaurants from all around the country use to free up their kitchen and staff, to focus on what matters most to them: Cooking great food and offering excellent customer service. We take customer calls and process orders for these restaurants." (https://rrtusa.com/careers/ (last visited on July 26, 2018).)

24.    According to its website, RRT is currently hiring Virtual Servers in the following states: Delaware, Florida, Idaho, Iowa, Kansas, Kentucky, Louisiana, Missouri, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, West Virginia and Wisconsin. (*Id.*)

25.    Defendant ADECCO USA, INC. is a Delaware corporation (File Number: 2809112) with its headquarters in Jacksonville, Florida. Adecco is licensed to do business in the State of Washington (UBI # 601 844 692), and its registered agent for service of process in Washington is C T Corporation System, 711 Capitol Way South, Suite 204, Olympia, Washington 98501.

26.    Adecco is one of the largest providers of recruitment and staffing services in the United States and specializes in temporary staffing, permanent job placement, outsourcing, temp-to-hire, recruiting, career transition (outplacement) services, vendor management services and payroll services.

## JOINT EMPLOYER ALLEGATIONS

27.    Under the FLSA, "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).

28.    The definition of "employer" under the FLSA is not limited by the common law concept of "employer," and is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes. *Real v. Driscoll Strawberry Assocs.*, 603 F.2d 748, 754 (9th Cir. 1979).

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

29.     Congress defined "employee" as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), describing this language as "the broadest definition that has ever been included in any one act." *United States v. Rosenwasser*, 323 U.S. 360, 363 (1945) (quoting 81 Cong. Rec. 7657 (1937) (statement of Sen. Hugo Black)); *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 300 (1985) (same).

30.     The determination of whether an employer-employee relationship exists does not depend on "isolated factors but rather upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947). The touchstone is "economic reality." *Goldberg v. Whitaker House Cooperative, Inc.*, 366 U.S. 28, 33 (1961).

31.     Two or more employers may jointly employ someone for purposes of the FLSA. *Falk v. Brennan,* 414 U.S. 190, 195 (1973). All joint employers are individually responsible for compliance with the FLSA. 29 C.F.R. § 791.2(a) (1981).

32.     Regulations issued by the DOL give the following examples of joint employment situations:

> (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
>
> (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

C.F.R. § 791.2(b) (footnotes omitted).

33.     The ultimate question of whether a party is an "employer" is a legal issue. *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1469–70 (9th Cir. 1983). The ultimate determination must be based "upon the circumstances of the whole activity." *Id.* at 1470 (citing *Rutherford Food Corp. v. McComb,* 331 U.S. 722 (1947)).

34.     Defendants jointly employed Plaintiff and all other Virtual Servers.

35.     Adecco pays Plaintiff and all other Virtual Servers. (***Exhibit 3***, Farley Pay Stub.)

36.     Adecco issues W-2 Wage and Tax Statements to Plaintiff and all other Virtual Servers. (***Exhibit 4***, Farley W2 Wage and Tax Statement.)

37.     Adecco furnishes Plaintiff and all other Virtual Servers with Adecco Employee

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

Handbooks. (***Exhibit 5***, Adecco Employee Handbook.)

38.    Adecco provides healthcare insurance and other related benefits to Plaintiff and all other Virtual Servers.

39.    On information and belief, Adecco assigns all or substantially all of RRT's Virtual Servers.

40.    Adecco and RRT jointly developed Virtual Servers' attendance policy.

Adecco and RRT came together and put in place the attached attendance policy to ensure that everyone is aware of expectations. This went into effect on 11/3/2016 and is being tracked very closely. It is extremely important that each of you show up on time and ready to work for each of your scheduled shifts. … If you are unable to make a shift, you need to notify Adecco and send in a shift swap approval request form … to quemanagers@rrtusa.com as soon as possible. This is to ensure that there is coverage for your shift. Anytime it is noticed that any one person has excessive, unexcused absences or tardies, that person will be contacted by Adecco.

I am sure you are all aware that call volume is high and not slowing down anytime soon. We are all in this together and want to make sure that each RRT caller is taken care of. If you have any questions regarding the attendance policy, or any other policies, please feel free to reach out to Adecco.

(***Exhibit 6***, November 23, 2016 email from Adecco Account Executive Jordan Lewis to Virtual Servers.)

41.    The Adecco Attendance and Punctuality Policy confirms that Adecco directly employs Plaintiff and all other Virtual Servers: "As an Adecco Associate, you are expected to be at work, and as scheduled for your assignment to RRT. Unexcused absences will not be tolerated. If you are going to be late or absent, it is your responsibility to notify Adecco <u>at least</u> 30 minutes before the start of your shift." (***Exhibit 7***, Adecco Attendance and Punctuality Policy (emphasis in original).) Failure to comply with the Adecco Attendance and Punctuality Policy "may result in corrective action, up to including termination, at Adecco's discretion." (*Id.*)

42.    Virtual Servers must inform <u>both</u> RRT and Adecco when they are going to be late or absent from a shift.

Attendance and punctuality is crucial for success while on assignment at RRT. If you are going to be absent or late, you must call Adecco and RRT <u>at least 30 minutes</u> prior to your shift time. Calling in after your scheduled start time may result in an unexcused absence. … YOU must call in your absence or tardy. Barring extreme circumstances, absence and tardy call-ins will only be accepted from the employee. Calls from friends, family, and coworkers may be considered unexcused based on Adecco's discretion. *Informing only

Adecco or only RRT will be considered failure to report the absence. This applies to all servers and SME.

(*Exhibit 8*, February 19, 2018 email from RRT Hiring & Development Liaison Kelly Tep to Virtual Servers (emphasis in original).)

43.      RRT issues *Virtual Server* Guidelines to all of its Virtual Servers. (*Exhibit 9*, Virtual *Server* Guidelines.) "These Guidelines are for all Adecco employees assigned to RRT as Virtual Servers who are home-based and are paid on an hourly basis. Servers who work at home are subject to these guidelines. Where differences occur in policies or procedures indicated, these guidelines will take precedence." (*Id.*, at 1.)

44.      RRT sets the Virtual Servers' work schedules. (*Id.*) ("Hours of work for the Server will be scheduled by RRT will be based on needs of the business.").

45.      "*RRT Virtual* Servers will be held accountable for working their schedule so that *RRT* can ensure that we are adequately staffed to meet inbound/outbound call volumes and/or non-phone work expectations for our clients." (*Id.*)

46.      "[Virtual] Servers are expected to devote their entire attention to their duties during work hours except when taking scheduled breaks and meal periods." (*Id.*)

47.      "Requests for schedule changes or other leave situations must be requested according to the *RRT* policies and procedures and will be granted or denied in accordance with such policies and procedures." (*Id.*)

48.      RRT determines how Virtual Servers are paid. (*Id.*, at 2) ("*RRT* Virtual Servers will be paid by the hour. Pay will be weekly. Pay is processed by Adecco."); (*See also* https://rrtusa.com/careers/ (last visited July 27, 2018)) ("We offer great opportunities, starting at $9/hr and a pay increase to $10/hr after completing your first 90 days!").

49.      RRT requires Virtual Serves to attend mandatory training sessions. (*Virtual Server* Guidelines, at 2.)

50.      "[Virtual] Servers must complete training with an acceptable competency in accordance with established *RRT* standards." (*Id.*)

51.      RRT strictly supervises its Virtual Servers, and adherence to RRT's operational guidelines is mandatory.

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

*RRT virtual* Servers will report to a supervisor identified and we expect consistent and frequent communication with this supervisor, as well as other supervisors. The communication methods and expectations listed below are not all inclusive:

- Participation in scheduled coaching sessions via phone, virtual meeting rooms or other online meeting sources, is mandatory.

- Servers must be available to make phone calls to and receive phone calls from their supervisor while in a Working Mode.

- Servers will be required to utilize chat tools, email and voicemail for the purposes of communicating with their supervisor.

- Servers must have their chat tool opened at all times during their shift for Real Time communication with their supervisor and other support resources.

- Additional operational guidelines and procedures may be required. Adherence to any additional operational guidelines provided by *RRT* will be mandatory.

(*Id.*)

52.     Virtual Servers must check in with their RRT supervisors no less than three times per shift. (*Id.*, at 3) ("[Virtual] Servers are responsible for checking in with their supervisor by chat, email or telephone at the start and end of each workday and when signing in and out for scheduled breaks. Servers are otherwise expected to be accessible by chat, email and/or phone during scheduled working hours.").

53.     The *Virtual Server* Guidelines reiterate the requirement to contact <u>both</u> Adecco and RRT when a Virtual Server will miss a shift. (*Id.*, at 2) ("If any incident occurs that prevents a Server from taking calls or performing work functions, immediate notification to Adecco and RRT supervisor is required via email & personal telephone call.").

54.     Virtual Servers must work when RRT expects them to. (*Id.*, at 3) ("We will work to create flexibility in scheduling where possible, but once scheduled, it is critical that our Servers work when we expect them to be working.").

55.     Violations of RRT's attendance policy "will result in progressive corrective action up to and including termination." (*Id.*)

56.     "[Virtual] Servers must obtain advanced approval at least 2 weeks before [scheduling] time off. Requests will be granted on a first come first served basis according to [RRT's] business rules." (*Id.*, at 3.)

57.     "For new hires, [Virtual Servers] are not allowed any vacation in the next 90 days, unless

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

it is an emergency. Approval is required." (*Id.*)

58.    "No shift swaps will be granted in the first 90 days of employment, unless it is an emergency. Approval is required." (*Id.*)

59.    "A maximum 15 days of unpaid vacation in a given year is allowed." (*Id.*)

60.    "*RRT Virtual Servers* are responsible for adhering to all IT Systems and Security Usage policies, as well as the *RRT* Code of Business Conduct[.]" (*Id.*, at 4.)

61.    "Failure to adhere to the procedures in this policy may result in corrective action up to and including termination of employment." (*Id.*)

62.    Upon being hired as RRT Virtual Servers, Plaintiff and all other Virtual Servers are given New Hire Credentials and an employee work email.



63.    The FLSA regulations explicitly state that a single worker may be "an employee to two or more employers at the same time." 29 C.F.R. 791.2(a); *see also Baystate Alt. Staffing, Inc. v. Herman*,

163 F.3d 668, 675 (1st Cir. 1998) ("The FLSA contemplates several simultaneous employers, each responsible for compliance with the Act.").

64.    On January 20, 2016, the DOL issued Administrator's Interpretation No. 2016-1, addressing joint employment under the FLSA and Migrant and Seasonal Agricultural Worker Protection Act. (*Exhibit 10*, Administrator's Interpretation No. 2016-1.) As explained by the DOL, "Vertical joint employment exists where the employee has an employment relationship with one employer (typically a **staffing agency,** subcontractor, labor provider, or other intermediary employer) and the economic realities show that he or she is economically dependent on, and thus employed by, another entity involved in the work." (*Id.*, (emphasis added).)

> Examples of situations where vertical joint employment might arise include garment workers who are directly employed by a contractor who contracted with the garment manufacturer to perform a specific function, *see Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71-72 (2d Cir. 2003); **nurses placed at a hospital by staffing agencies**, *see Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 143-49 (2d Cir. 2008); or warehouse workers whose labor is arranged and overseen by layers of intermediaries between the workers and the owner or operator of the warehouse facility, *see Carrillo v. Schneider Logistics Trans-Loading & Distrib., Inc.*, 2014 WL 183956, at *9-15 (C.D. Cal. Jan. 14, 2014). *See also A-One Med. Servs., 346 F.3d at 917; Lantern Light*, 2015 WL 3451268, at *3 (where company has contracted for workers who are directly employed by an intermediary, court applies vertical joint employment analysis to relationship between company and workers); *Berrocal v. Moody Petrol., Inc.*, 2010 WL 1372410, at *11 n.16 (S.D. Fla. Mar. 31, 2010) (vertical joint employment may exist when "an employer hires laborers through a third party labor contractor").

(*Id.*, (emphasis added).)

65.    The fact that each Defendant may not have exercised each and every aspect of the test for employer under the law, and may have delegated some of the responsibilities to others, does not alter their status as employers; it merely makes them joint employers. *Bonnette, supra* at 1470.

66.    Whether employers, or joint employers, each Defendant is nevertheless liable for the wage violations pleaded in this Complaint. *Falk, supra;* 29 C.F.R. § 791.2(a).

67.    The above well-pleaded facts all support Plaintiff's standing to sue the Defendants named herein as joint employers and seek damages for the alleged violations under a joint employment theory. *Conde v. Open Door Mktg., LLC*, 223 F. Supp. 3d 949, 966 (N.D. Cal. 2017); *Haralson v. United Airlines,*

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

*Inc.*, 224 F. Supp. 3d 928, 940 (N.D. Cal. 2016).

68.     Upon information and belief, Defendants jointly employed hundreds of Virtual Servers—including Plaintiff—across various states throughout the country in the last four years.

69.     Plaintiff believes, and alleges thereon, that Defendants are jointly and severally responsible for the circumstances alleged herein, and proximately caused the fraudulent, unlawful, unfair, deceptive acts and wage violations complained of herein.

70.     At all times herein mentioned, Defendants approved of, condoned, and/or otherwise ratified each and every one of the acts or omissions complained of herein.

71.     Defendants acted willfully in violating the laws and regulations pleaded in this Complaint.

72.     At all times herein mentioned, Defendants' acts and omissions proximately caused the complaints, injuries, and damages alleged herein.

## GENERAL ALLEGATIONS

73.     As a Virtual Server for RRT, Plaintiff was responsible for, among other things, "perform[ing] takeout order processing for restaurants all across the country. Working from the comforts of [their] home, [Virtual Servers] support numerous different restaurant chains and handle their incoming food orders to support their takeout operations." (https://rrtusa.com/careers/ (last visited July 27, 2018).)

74.     Upon information and belief, all of RRT's Virtual Servers are hourly, non-exempt employees.

75.     RRT's Virtual Servers use similar computer networks, software programs and applications in the course of performing their job responsibilities. These programs and applications are integral and an important part of Virtual Servers' work, and they cannot perform their jobs without them.

76.     RRT's Virtual Servers receive substantially the same training, are subject to the same disciplinary policies, and are subject to quality assurance reviews based on the same or similar criteria.

77.     The evidence unequivocally shows that RRT maintains a company-wide policy and practice of requiring Virtual Servers to perform substantial amounts of work activities off the clock (*i.e.*, unpaid).

78.     In fact, RRT's off-the-clock work requirements are so entrenched within its corporate

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

culture that it openly communicates these illegal policies to its Virtual Servers.

79.    For example, RRT expressly instructed and trained Virtual Servers to have all their computer networks, software programs and applications opened and ready *before* starting their shifts, so that they are available and ready to take calls as soon as their shifts start.

> Team it is imperative that you log in on time for your shift that means if you are scheduled for 9am you should be in the que and ready to take calls at 9am this impact our calls when you're not on time.

(*Exhibit 11*, July 3, 2018 email from RRT Operations Supervisor Della Millring to Virtual Servers.)

72.    In addition, RRT expressly instructed and trained Virtual Servers to check for and download necessary software updates *before* starting their shifts.



73.    RRT also expressly trained and instructed Virtual Servers to run CCleaner—a utility program used to clean potentially unwanted files and invalid Windows Registry entries from a computer—*before* their shifts: "Make sure to run CC Cleaner **before your shift today**." (*Exhibit 12*, June 5, 2018 email from RRT Hiring & Development Liaison Kelly Tep to Virtual Servers (emphasis added).)

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

74.     RRT uses the computer program "Telax" to track Virtual Servers' hours worked for purposes of compensation but expressly trained and instructed Virtual Servers not to log into Telax until *after* logging and signing into all other necessary software programs and applications.

> **When running Paperspace application. Please make sure that;** 1. Bria "OR" Accession is open on your main desktop first (Outside of Paperspace) 2. You are logged out of Telax on your main desktop before starting the Paperspace application.

(***Exhibit 13***, December 15, 2017 email from RRT Subject Matter Expert–Tech Support Brianna Torres to Virtual Servers (emphasis in original).)

75.     RRT's common policy and practice of requiring Virtual Servers to perform substantial amounts of off-the-clock work activities extends beyond the uncompensated pre-shift tasks articulated above. Indeed, the evidence unequivocally shows that RRT maintained a common policy and practice of requiring Virtual Servers to perform substantial amounts of pre-, mid- and post-shift work activities off the clock (*i.e.*, unpaid).

### A.      Pre-Shift Off-the-Clock Work

76.     Pursuant to RRT's policies, training and direction, Plaintiff and all other Virtual Servers are required to start up and log into various secure computer programs, software programs and applications in order to access information. The pre-shift startup and login process takes substantial time on a daily basis with said time ranging from ten to 20 minutes per shift, or even longer when technical issues arise. Before clocking in, Plaintiff and each Virtual Server must undertake the following essential work tasks in chronological order:

- *First*, Virtual Servers must turn-on/warm-up their computers;

- *Second*, Virtual Servers must search for, open up and run CCleaner (all other computer software programs and applications must be closed in order for CCleaner to properly work);

- *Third*, Virtual Servers must open Bria and type in their login and password;

- *Fourth*, Virtual Servers must open up Google Chrome and search for www.paperspace.com;

- *Fifth*, once Paperspace is open, Virtual Servers must click "logon," enter a domain, type in their login and password, and sign in to Paperspace;

- *Sixth*, within Paperspace, Virtual Servers must open up Telax and type in their password

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

(but do not login yet);

- *Seventh*, Virtual Servers must click on Internet Explorer ("IE"), log in with a username and password, and delete their histories within IE;

- *Eighth*, Virtual Servers must open Skype (which allows them to communicate with team members and RRT's managers/supervisors) and type "here" in the team chat (but not hit "enter" because they are not yet on the clock); and

- *Ninth*, Virtual Servers must pull up Bria, log into Telax (Virtual Servers are now on the clock), log into RRT's customer relationship management ("CRM") software, and then go to Skype and hit "enter." Once Virtual Servers log into Telax, they receive their first customer call within 17 or 18 seconds.

77. RRT's Virtual Servers complete this process *before* clocking in, meaning that they perform off-the-clock work in the range of ten minutes or more per shift without compensation.

78. The unpaid off-the-clock work performed prior to each shift by Plaintiff and all other Virtual Servers directly benefits RRT, and the tasks undertaken in connection with the off-the-clock work are integral and indispensable to their job duties and responsibilities as Virtual Servers.

79. The pre-shift boot up and login activities described above (and the time spent by Virtual Servers performing these activities) assume that Virtual Servers encounter no technical difficulties while logging into RRT's software programs and applications. The evidence, however, unequivocally shows that Virtual Servers routinely encounter technical difficulties while logging into RRT's systems, or have to wait an inordinate amount of time for software updates to finish loading.

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453





SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453



COLLECTIVE CLASS ACTION COMPLAINT AND JURY DEMAND
Page 17 of 40

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453



SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453



80.     Because RRT expressly instructed and trained Virtual Servers to log into all other software programs and applications and perform all necessary software updates *before* logging into RRT's timekeeping system (Telax), Virtual Servers are not compensated for the time spent resolving these technical difficulties or waiting for software updates to finish loading. Instead, Virtual Servers are required to perform these activities off the clock.

**B.      Mid-Shift Off-the-Clock Work**

***RRT maintains a common policy and practice of booting Virtual Servers from its system***

81.     Pursuant to RRT's policies, training and direction, RRT expressly instructed Plaintiff and all other Virtual Servers that they would be booted from RRT's system if they spend too much time—generally, 15 seconds or more—in "wrap up."

82.     At the conclusion of each customer phone call, a Virtual Server's status automatically changes to "wrap up," which signals that the Virtual Server is completing and processing a customer's order and is temporarily unavailable to take customer calls. Once the Virtual Server finishes processing the order, they are required to change their status to "available."

COLLECTIVE CLASS ACTION COMPLAINT AND JURY DEMAND
Page 19 of 40

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

83.     At all times material hereto, RRT maintained a uniform policy and practice of booting Virtual Servers if they spend too much time in "wrap up."

84.     RRT's uniform policy and practice of booting Virtual Servers has enormous implications. Specifically, by booting Virtual Servers from the system, RRT is also booting them from the timekeeping system (Telax). Thus, Virtual Servers must boot up and log back into RRT's software programs and applications off the clock.

85.     What's more, Virtual Servers do not receive notification that they have been kicked out of the system until *after* they have completed the customer's order.

86.     It can take several seconds or up to several minutes to complete a customer's order, depending upon the size and complexity of the order. Once notified that RRT has booted them from the system, Virtual Servers must boot up and log back into RRT's software programs and applications, and then clock back in using RRT's timekeeping system (Telax). All of these activities are off the clock (*i.e.*, unpaid).

87.     Oftentimes, RRT will boot or threaten to boot Virtual Servers for spending too much time in "wrap up" when, in fact, the Virtual Server is in "available" status, not "wrap up." For example, on multiple occasions, RRT threatened to boot Plaintiff Farley after mistakenly concluding that she was in "wrap up" for over four or five minutes.

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453





SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

88.     Other times, RRT's software programs mistakenly indicate that a Virtual Server is "offline," when, in fact, the Virtual Server is either on the phone with a customer or processing an order. Here, Plaintiff Farley was taking and processing an order for 14 people but was booted from RRT's system (including Telax).



89.     In addition to its common policy and practice of booting Virtual Servers for spending too much time in "wrap up," RRT maintains a common policy and practice of booting Virtual Servers who are experiencing technical issues, even when Virtual Servers signal the technical issues by changing their status to "tech issues."

90.     Notwithstanding the fact that technical issues experienced by Virtual Servers are invariably the product of RRT's software programs, servers, systems or applications, RRT warned Virtual Servers that they will be booted from the system (*i.e.*, will not be paid for time spent resolving technical issues) if they do not use the "technical issue template" when reporting any tech issues,

Please use technical issue template when reporting any tech issues. This is in daily updates

COLLECTIVE CLASS ACTION COMPLAINT AND JURY DEMAND
Page 22 of 40

email. IF YOU ARE HAVING TECH RELATED ISSUES, YOU MUST FOLLOW THESE STEPS. IF YOU DO NOT FOLLOW THESE STEPS AND YOU ARE IN TECH ISSUES, WE WILL ASSUME YOU DO NOT HAVE A TECH RELATED PROBLEM AND LOG YOU OUT!!!!!

(*Exhibit 14*, January 4, 2017 email from RRT Operations Supervisor Laura May to Virtual Servers.)

91.    The evidence shows that Virtual Servers routinely encounter freezing and other technical issues with RRT's software programs and applications; and that in order to resolve the technical issues, Virtual Servers are required to shut down and reboot the entire system.

92.    In fact, when RRT's software programs and applications freeze or other technical issues arise, RRT's policy is to boot Virtual Servers from the system (including Telax) and end their sessions. Thus, Virtual Servers are not paid for *any* time spent resolving technical issues or booting up and logging back into RRT's software programs and applications.



SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453



SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

93.    In order to resolve technical issues with RRT's software programs and applications, RRT expressly instructed and trained Virtual Servers to run CCleaner, despite the fact that running CCleaner requires Virtual Servers to shut down their internet browser and RRT's customer relationship management ("CRM") software, including Telax. Thus, Virtual Servers are required to resolve RRT's technical issues off-the clock.

**Clean Only** – Use this during your breaks and/or whenever the CRM or your softphone is acting weird. The script prompt you for permission to run then will shut down **ALL** your browser and CRM windows then clean your cache.

(**Exhibit 15**, June 26, 2017 email from RRT Hiring & Development Liaison Kelly Tep to Virtual Servers (emphasis in original).)

94.    In addition, RRT expressly instructed and trained Virtual Servers to clean and reboot their machines whenever RRT's CRM software freezes, *a process that takes up to five minutes!*

**Clean and Reboot** – Use this during your breaks and/or whenever the CRM has completely frozen. Use this if Clean Only does not seem to fix the issue. The script prompt you for permission to run then will run the same process as Clean Only and reboot your machine within 5 minutes. A notification will pop up telling you your computer will be rebooting.

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

(*Id.* (emphasis in original).) Thus, whenever RRT's software programs and applications freeze, Virtual Servers are required to perform no less than five minutes of off-the-clock work cleaning and rebooting their machines. Virtual Servers must then spend *additional* time opening up and logging back into RRT's software programs and applications, including Telax.

95.     To recap, when Virtual Servers experience technical issues with RRT's software programs and applications, RRT's common policy and practice is to boot Virtual Servers from the system (including Telax), require them to run time-consuming cleaning software (CCleaner), and open up and log back into RRT's software programs and applications – all off-the-clock. When RRT's software programs and applications freeze, the additional step of rebooting the computer is required.

96.     The mid-shift off-the-clock work performed by Plaintiff and all other Virtual Servers directly benefits RRT, and the tasks undertaken in connection with the off-the-clock work are integral and indispensable to their job duties and responsibilities as Virtual Servers.

C.     **Post-Shift Off-the-Clock Work**

97.     Pursuant to RRT's policies, training and direction, Plaintiff and all other Virtual Servers are required to shut down and logout of certain computer programs and applications they use during their shift *after* they log-out of RRT's timekeeping system. The post-shift logout and shutdown process takes substantial time on a daily basis with said time ranging from two to three minutes per shift, but can take as long as ten minutes if the Virtual Server experiences technical problems with RRT's software programs and applications.

98.     Pursuant to RRT's policies, training and direction, Plaintiff and the Virtual Servers are not permitted to begin the shutdown and log-out process until *after* their shifts end and *after* they clock out of RRT's timekeeping system. In this regard, RRT requires Plaintiff and the Virtual Servers to clock out of the timekeeping system right at the end of their scheduled shifts, as opposed to when they finish performing all required work activities and tasks.

99.     Subsequent to their post-shift shutdown and log-out activities, Virtual Servers are once again required to run CCleaner.

**Clean and Shutdown** – Use this when you are done with your shift or shutting down your machine. The script prompt you for permission to run then will Clean and then shutdown

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

your machine for you.

(*Id.* (emphasis in original).) This results in *additional* off-the-clock work for which Plaintiff and Virtual Servers are not compensated for at the end of their shifts.

100.    Consequently, RRT maintains a common plan and policy pursuant to which it fails to pay Virtual Servers for no less than two to three minutes per day of work performed in connection with their end of shift shutdown, log-out and cleaning activities.

101.    The unpaid off-the-clock work performed subsequent to each shift by Plaintiff and all other Virtual Servers directly benefits RRT, and the tasks undertaken in connection with the off-the-clock work are integral and indispensable to their job duties and responsibilities as Virtual Servers.

### D.    <u>Additional Off-the-Clock Allegations</u>

102.    In addition to the pre-, mid-, and post-shift off-the-clock work articulated above, Virtual Servers who cannot work all or a portion of their scheduled shifts are required to use RRT's Coverage Chat message board to find another Virtual Server to cover for them.



103.    On average, it takes Virtual Servers anywhere from five to 20 minutes to find coverage.

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

Defendants do not pay Virtual Servers for any of this time.

104.    In addition, RRT trained and instructed Virtual Servers to check and respond to work-related emails and to check the Important Updates Only Chat on a daily basis (including days they are not scheduled to work) for updates on different concepts, new menu items, updated protocols (such as how to respond to customer complaints), etc.

105.    The time spent by Virtual Servers checking and responding to work-related emails, and reading and learning about important updates and new menu items, is an essential part of their jobs, and these activities and the time associated with these activities (generally five to seven minutes per day) are not *de minimis*.

106.    Virtual Servers are also required to check the work schedule on a daily basis, even on days they are not scheduled to work.

> It is 100% your responsibility to check the schedule on a daily basis. We have had numerous Servers missing time because they just assume they are not working on a given day. To be clear – we are not adding random hours throughout the week, but you must check the schedule.

(***Exhibit 16***, April 24, 2018 email from RRT Vice President of Operations Stacey Raus to Virtual Servers.)

107.    On information and belief, RRT was responsible for reporting the number of hours each Virtual Server worked to Adecco, so that Adecco could issue paychecks to Plaintiff and the Virtual Servers. Although Plaintiff and all other Virtual Servers performed substantial amounts of pre-, mid-, and post-shift work activities off the clock, RRT did not report this time to Adecco.

108.    In addition, RRT specifically underreported the number of "on-the-clock" hours worked to Adecco. Plaintiff and Virtual Servers routinely noticed discrepancies (as much as one to two hours per week) between the number of hours that they were clocked into RRT's timekeeping system (Telax) and the number of hours they were actually paid for. Thus, not only did Defendants fail to pay Plaintiff and the Virtual Servers for their off-the-clock work, they failed to pay them for substantial amounts of "on-the-clock" work as well.

109.    Although Adecco was aware or had reason to be aware that Plaintiff and all other Virtual Servers were working off the clock and that RRT underreported the number of hours worked, Adecco did

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

nothing to ensure proper payment for all hours that the Virtual Servers worked.

**E.     Defendants Failed to Include All Remuneration When Calculating <u>Virtual Servers'</u> <u>Regular Rates of Pay</u>**

110.    Under the FLSA the "regular rate" at which an employee must be paid includes "all remuneration for employment paid to, or on behalf of, the employee, divided by hours worked in a workweek." 29 U.S.C. § 207(e); *see also* 29 C.F.R. § 778.211 ("Bonuses which are announced to employees to induce them to work more steadily or more rapidly or more efficiently or to remain with the firm are regarded as part of the regular rate of pay. Attendance bonuses, individual or group production bonuses, bonuses for quality and accuracy of work, bonuses contingent upon the employee's continuing in employment until the time the payment is to be made . . . must be included in the regular rate of pay."); 29 C.F.R. § 778.211 ("For example, any bonus which is promised to employees upon hiring or which is the result of collective bargaining would not be excluded from the regular rate under this provision of the Act."). This general rule has exceptions, none of which is relevant here. *See* § 207(e)(1)-(8).

111.    Defendants pay non-discretionary bonuses to Plaintiff and all other Virtual Servers but do not factor those bonuses into the calculation of their regular rate of pay for all hours worked in a pay period.

112.    For example, on January 17, 2018, RRT announced, "there will be a bonus plan available to all [Virtual] Servers, SME's and Supervisor's. This is an opportunity to make extra money on every order that is placed." (***Exhibit 17***, January 17, 2018 and April 15, 2018 emails from RRT Vice President of Operations Stacey Raus to Virtual Servers.)

113.    "For each successful voice order that is placed (does not include fails, cancels or voids), the [Virtual] server will receive 10 cents." (*Id.*)

114.    "On average this means each [Virtual] server will earn anywhere from an extra 50 cents per hour to over a dollar an hour in some cases. As an example, many FULL TIME servers will get $120-$180 (or more) extra per month." (*Id.*)

115.    "This bonus will be paid monthly meaning the January 15-31 bonus will be paid on the second paycheck in February. February 1-28th will be paid in March (second week's paycheck)." (*Id.*)

116.    On April 15, 2018, RRT issued an update to its Virtual Servers regarding the success of

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

the bonus program.

> Good morning - today marks the end of the 90 day trial period for the Bonus that started on January 15th. We will have paid out almost $20,000 in that time!!! Many servers are earning $.75 to over $1.00 per hour more with this bonus. … Our goal is to reward the best servers and to drive quality and efficiency higher.

(*Id.*)

117.   These bonus payments should in fact have been included in the calculation of Plaintiff's and all other Virtual Servers' regular rates of pay for overtime purposes. Defendants failed to include all remuneration for employment paid to, or on behalf of, the employee in the employees' regular rate of pay. Upon information and belief, all Virtual Servers employed by Defendants were paid in the same manner.

**F.   Exemplary Pay-Period to Illustrate Off-the-Clock Compensation Deficiencies**

118.   An example of a specific workweek where Defendants failed to pay Plaintiff all overtime due for hours worked in excess of 40 (as mandated by the FLSA) includes the following:

### Pay Period of 02/19/18-02/25/18

- Plaintiff was paid at a rate of $10.00 per hour for her 40.00 regular hours and $15.00 per hour for 11.63 overtime hours.

- With unpaid pre-shift, mid-shift and post-shift time, in a range of 17 to 43 minutes per shift, at five shifts per week, Plaintiff should have been paid an additional 85 to 215 minutes at her overtime rate of $15.00 during the pay period.

(***Exhibit 3***, Farley Pay Stub.)

**G.   Defendants Benefitted from the Uncompensated Off-the-Clock Work**

119.   At all relevant times, Defendants directed and directly benefited from the work performed by Plaintiff and similarly situated employees in connection with the above described pre-, mid-, and post-shift activities.

120.   At all relevant times, Defendants controlled the work schedules, duties, protocols, applications, assignments and employment conditions of Plaintiff and all other Virtual Servers.

121.   At all relevant times, Defendants used their attendance and adherence policies against Plaintiff and the Virtual Servers in order to pressure them into performing the pre, mid, and post-shift off-the-clock work.

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

122.   At all relevant times, Defendants' policies and practices deprived Plaintiff and Virtual Servers of wages owed for the pre-, mid-, and post-shift activities they performed. Because Virtual Servers typically worked 40 hours or more in a workweek, Defendants' policies and practices also deprived them of overtime pay.

123.   Defendants knew or should have known that the time spent by Plaintiff and other Virtual Servers in connection with the pre-, mid-, and post-shift activities is compensable under the law. Indeed, in light of the explicit DOL guidance cited above, there is no conceivable way for Defendants to establish that they acted in good faith.

124.   Despite knowing that Plaintiff and other Virtual Servers performed uncompensated work before, during and after their scheduled shifts, Defendants failed to make any effort to stop or disallow the off-the-clock work and instead suffered and permitted it to happen.

125.   Unpaid wages related to the off-the-clock work described herein are owed to Plaintiff and Virtual Servers at the FLSA mandated overtime premium of one and one-half their regular hourly rates because Plaintiff and Virtual Servers regularly worked in excess of 40 hours in a workweek.

## FLSA COLLECTIVE ACTION ALLEGATIONS

126.   Plaintiff brings this action pursuant to 29 U.S.C. § 216(b) of the FLSA on her own behalf and on behalf of:

> **All Virtual Servers who worked for Defendants at any time from August 10, 2015 through judgment.**

(hereinafter referred to as the "FLSA Collective"). Plaintiff reserves the right to amend this definition if necessary.

127.   Defendants are liable under the FLSA for, *inter alia*, failing to properly compensate Plaintiff and other similarly situated Virtual Servers.

128.   Excluded from the proposed FLSA Collective are Defendants' executives, administrative and professional employees, including computer professionals and outside sales persons.

129.   Consistent with Defendants' policy and pattern or practice, Plaintiff and the members of the FLSA Collective were not paid premium overtime compensation for all hours worked beyond 40 hours in a workweek.

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

130.    Defendants assigned and/or were aware of all of the work that Plaintiff and the members of the FLSA Collective performed.

131.    As part of their regular business practices, Defendants intentionally, willfully and repeatedly engaged in a pattern, practice and/or policy of violating the FLSA with respect to Plaintiff and the members of the FLSA Collective. This policy and pattern or practice includes, but is not limited to:

    a.    Willfully failing to pay their employees, including Plaintiff and the members of the FLSA Collective, premium overtime wages for all hours worked in excess of 40 hours per workweek; and

    b.    Willfully failing to record all of the time that their employees, including Plaintiff and the members of the FLSA Collective, worked for the benefit of Defendants.

132.    Defendants are aware or should have been aware that federal law required them to pay Plaintiff and the members of the FLSA Collective overtime premiums for all hours worked in excess of 40 per workweek.

133.    Defendants' unlawful conduct has been widespread, repeated and consistent.

134.    A collective action under the FLSA is appropriate because the employees described above are "similarly situated" to Plaintiff under 29 U.S.C. § 216(b). The employees on behalf of whom Plaintiff brings this collective action are similarly situated because (a) they have been or are employed in the same or similar positions; (b) they were or are performing the same or similar job duties; (c) they were or are subject to the same or similar unlawful practices, policy, or plan; and (d) their claims are based upon the same factual and legal theories.

135.    The employment relationships between Defendants and every proposed FLSA Collective member are the same and differ only by name, location, and rate of pay. The key issues – the amount of uncompensated pre-shift start-up/log-in time, mid-shift off-the-clock work, and post-shift log-out/shut-down time owed to each employee – do not vary substantially among the proposed FLSA Collective members.

136.    Many similarly situated current and former Virtual Servers have been underpaid in violation of the FLSA and would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

137.    This notice should be sent to the FLSA Collective pursuant to 29 U.S.C. § 216(b).

138.    Those similarly situated employees are known to Defendants, are readily identifiable, and can be located through Defendants' records.

139.    Plaintiff estimates the proposed FLSA Collective, including both current and former employees over the relevant period, will include several hundred workers. The precise number of FLSA Collective members should be readily available from a review of Defendants' personnel and payroll records.

## RULE 23 CLASS ACTION ALLEGATIONS

140.    Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on her own behalf and on behalf of:

**All Virtual Servers who worked for Defendants during the applicable statutory period.**

(hereinafter referred to as the "Rule 23 Nationwide Class"). Plaintiff reserves the right to amend the putative class definition if necessary.

141.    The members of the Rule 23 Nationwide Class are so numerous that joinder of all Rule 23 Nationwide Class members in this case would be impractical. Plaintiff reasonably estimates that there are hundreds of Rule 23 Nationwide Class members. Rule 23 Nationwide Class members should be easy to identify from Defendants' computer systems and electronic payroll and personnel records.

142.    There is a well-defined community of interests among Rule 23 Nationwide Class members and common questions of law and fact predominate in this action over any questions affecting individual members of the Rule 23 Nationwide Class. These common legal and factual questions, include, but are not limited to, the following:

a.    Whether the Rule 23 Nationwide Class performed uncompensated pre- mid-, or post-shift off-the-clock work and, if so, the amount thereof;

b.    Whether the Rule 23 Nationwide Class was entitled to compensation (including overtime pay) for any pre-, mid-, or post-shift off-the-clock work they performed and, if so, the amount thereof; and

c.    Whether Defendants were unjustly enriched due to their non-payment of wages for all compensable time.

143.    Plaintiff's claims are typical of those of the Rule 23 Nationwide Class in that she and all

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

other Rule 23 Nationwide Class members suffered damages as a direct and proximate result of Defendants' common and systemic payroll policies and practices. Plaintiff's claims arise from the same pay policies, practices, promises and course of conduct as all other Rule 23 Nationwide Class members' claims, and her legal theories are based on the same legal theories as all other Rule 23 Nationwide Class members.

144.   Plaintiff will fully and adequately protect the interests of the Rule 23 Nationwide Class and has retained counsel qualified and experienced in the prosecution of nationwide wage and hour class actions. Neither Plaintiff nor her counsel have interests that are contrary to, or conflicting with, the interests of the Rule 23 Nationwide Class.

145.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because, *inter alia*, it is economically infeasible for Rule 23 Nationwide Class members to prosecute individual actions of their own given the relatively small amount of damages at stake for each individual along with the fear of reprisal by their employer.

146.   This case will be manageable as a Rule 23 Class action. Plaintiff and her counsel know of no unusual difficulties in this case, and Defendants have advanced networked computer and payroll systems that will allow the class, wage, and damages issues in this case to be resolved with relative ease.

147.   Because the elements of Rule 23(b)(3) are satisfied in this case, class certification is appropriate. *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393; 130 S. Ct. 1431, 1437 (2010) ("By its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action.").

148.   Because Defendants acted and refused to act on grounds that apply generally to the Rule 23 Nationwide Class and declaratory relief is appropriate in this case with respect to the Rule 23 Nationwide Class as a whole, class certification pursuant to Rule 23(b)(2) is also appropriate.

## COUNT I
## VIOLATION OF FLSA, 29 U.S.C. § 201, *et seq.*
## FAILURE TO PAY OVERTIME WAGES
## (On Behalf of the FLSA Collective)

149.   Plaintiff re-alleges and incorporates all previous paragraphs herein.

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

150.    At all times relevant to this action, Defendants were engaged in interstate commerce, or in the production of goods for commerce, as defined by the FLSA.

151.    At all times relevant to this action, Plaintiff and the FLSA Collective were "employees" of Defendants within the meaning of 29 U.S.C. § 203(e)(1) of the FLSA.

152.    Plaintiff and the FLSA Collective, by virtue of their job duties and activities actually performed, are non-exempt employees.

153.    Plaintiff and the FLSA Collective either: (1) engaged in commerce; or (2) engaged in the production of goods for commerce; or (3) were employed in an enterprise engaged in commerce or in the production of goods for commerce.

154.    At all times relevant to this action, Defendants "suffered or permitted" Plaintiff and the FLSA Collective to work and thus "employed" them within the meaning of 29 U.S.C. § 203(g) of the FLSA.

155.    At all times relevant to this action, Defendants required Plaintiff and the FLSA Collective to perform no less than 17 and as much as 43 minutes of off-the-clock work per shift, but failed to pay these employees the federally mandated overtime compensation for the off-the-clock work.

156.    The off-the-clock work performed by Plaintiff and the FLSA Collective is an essential part of their jobs, and these activities and the time associated with these activities are not *de minimis*.

157.    In workweeks where Plaintiff and other FLSA Collective members worked 40 hours or more, the uncompensated off-the-clock work time, and all other overtime, should have been paid at the federally mandated rate of 1.5 times each employee's regular hourly wage, including the shift differential where applicable. 29 U.S.C. § 207.

158.    29 U.S.C. Section 207(e) defines the regular rate "at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee" (with certain exceptions not relevant here) divided by the hours worked.

159.    By failing to include all remuneration including bonuses and other non-discretionary payments in the total sum earned before dividing by hours worked, Defendants failed to pay the correct hourly rate for overtime hours worked.

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

160.    Defendants' violations of the FLSA were knowing and willful. Defendants knew or could have determined how long it takes the Virtual Servers to perform their off-the-clock work. Further, Defendants could have easily accounted for and properly compensated Plaintiff and the FLSA Collective for these work activities, but did not.

161.    The FLSA, 29 U.S.C. § 216(b), provides that as a remedy for a violation of the Act, an employee is entitled to his or her unpaid wages (including unpaid overtime), plus an additional equal amount in liquidated (double) damages, plus costs and reasonable attorneys' fees.

**COUNT II**
**UNJUST ENRICHMENT**
**(On Behalf of the Rule 23 Nationwide Class)**

162.    Plaintiff re-alleges and incorporates all previous paragraphs herein.

163.    At all times relevant to this action, Defendants promised Plaintiff and every other Rule 23 Nationwide Class member a pre-established regular hourly rate in consideration of the work duties Plaintiff and the Rule 23 Nationwide Class members performed for the benefit of Defendants.

164.    Upon information and belief, each Rule 23 Nationwide Class member, including Plaintiff, has an hourly rate of approximately $10.00 per hour.

165.    Plaintiff and every other Rule 23 Nationwide Class member relied upon Defendants' promise for the pre-established regular hourly rate and performed by doing their jobs and carrying out their required work duties.

166.    By not paying Plaintiff and every other Rule 23 Nationwide Class member the agreed upon hourly wage for the pre-, mid-, and post-shift off-the-clock work they performed each shift, Defendants were unjustly enriched.

167.    Plaintiff and the Rule 23 Nationwide Class members performed off-the-clock work tasks at the request of and without objection by Defendants.

168.    Defendants received and accepted the above-referenced off-the-clock work services from Plaintiff and every other Rule 23 Nationwide Class Member and enjoyed the benefits derived therefrom.

169.    Upon information and belief, Defendants used the monies owed to Plaintiff and every other Rule 23 Nationwide Class Member to finance their various business ventures or pay their equity owners.

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

170.    Defendants have been unjustly enriched by the retention of monies received pursuant to the services Plaintiff and the Rule 23 Nationwide Class performed for Defendants' benefit, without having compensated Plaintiff and the Rule 23 Nationwide Class for the same.

171.    Plaintiff and the Rule 23 Nationwide Class suffered detriment as a result of Defendants' failure to compensate them for the off-the-clock work described herein, in that Plaintiff and the Rule 23 Nationwide Class were deprived of the ability to utilize that time, effort and their resources in a profitable manner.

172.    As a direct and proximate result of Defendants' actions, Plaintiff and every other Rule 23 Nationwide Class Member have suffered damages, including but not limited to, loss of wages.

**COUNT III**
**BREACH OF CONTRACT**
**(In the Alternative to Count II)**
**(On Behalf of the Rule 23 Nationwide Class)**

173.    Plaintiff re-alleges and incorporates all previous paragraphs herein.

174.    Plaintiff's breach of contract claim is pled in the alternative to her unjust enrichment claim (Count II).

175.    At all times relevant to this action, Defendants had a contract with Plaintiff and every other Rule 23 Nationwide Class Member to pay each employee for each hour they worked at a pre-established (contractual) regularly hourly rate.

176.    Each Rule 23 Nationwide Class Member's contractual hourly rate is identified in paystubs and other records that Defendants prepare as part of their regular business activities.

177.    Upon information and belief, each Rule 23 Nationwide Class member, including Plaintiff, has an hourly rate equal to $10.00 per hour.

178.    Plaintiff and every other Rule 23 Nationwide Class member performed under the contract by doing their jobs and carrying out the work they performed each shift including the unpaid work that was required of them, accepted by Defendants, and that they performed.

179.    For example, Defendants failed to compensate Plaintiff and the Rule 23 Nationwide Class Members for essential pre- and post-shift work tasks such as opening/running/logging into and

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

closing/logging out of RRT's software programs, systems and applications.

180.   By not paying Plaintiff and every other Rule 23 Nationwide Class Member the agreed upon hourly wage for all of the work they performed each shift, Defendants systematically breached their contracts with Plaintiff and each member of the Rule 23 Nationwide Class.

181.   Plaintiff's and the Rule 23 Nationwide Class Members' remedies under the FLSA are inadequate in this case to the extent Defendants paid them more than the federally mandated minimum wage of $7.25 per hour but less than 40 hours per week (i.e., pure "gap time" claims).

182.   Defendants also breached their duty of good faith and fair dealing by failing to keep track of the time Plaintiff and other Rule 23 Nationwide Class Members spent performing the off-the-clock activities, which is a fundamental part of an employer's job.

183.   As a direct and proximate result of Defendants' breaches of the contracts alleged herein, Plaintiff and every other Rule 23 Nationwide Class Member has been damaged, in an amount to be determined at trial.

184.   These claims are appropriate for nationwide class certification under Rules 23(b)(2) and (b)(3) because the law of contracts is substantially the same throughout the United States.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on her own behalf and on behalf of the putative Collective and Rule 23 Nationwide Class, requests judgment as follows:

a.   An Order conditionally certifying this case as a collective action in accordance with 29 U.S.C. § 216(b) with respect to the FLSA claims set forth herein (Count I);

b.   An Order certifying this action as a class action (for the Rule 23 Nationwide Class) pursuant to Rule 23(b)(2) and (b)(3) with respect to Plaintiff's unjust enrichment and/or breach of contract claims (Counts II-III);

c.   An Order compelling Defendants to disclose in computer format, or in print if no computer readable format is available, the names and addresses of all proposed FLSA Collective and Rule 23 Nationwide Class members, and authorizing Plaintiff to send notice of this action to all those similarly situated individuals, including the publishing of notice in a manner that is reasonably calculated to apprise the class members of their rights by law to join and participate in this lawsuit;

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

d. An Order designating Plaintiff as representative of the FLSA Collective and the Rule 23 Nationwide Class, and undersigned counsel as Class counsel for the same;

e. An Order declaring Defendants violated the FLSA and the DOL's attendant regulations as cited herein;

f. An Order declaring Defendants' violations of the FLSA were willful;

g. An Order declaring Defendants were unjustly enriched and/or breached their contracts with Plaintiff and the Rule 23 Nationwide Class by failing to pay Plaintiff and the Rule 23 Nationwide Class for each hour they worked at a pre-established regular hourly rate;

h. An Order granting judgment in favor of Plaintiff and against Defendants and awarding Plaintiff, the FLSA Collective, and the Rule 23 Nationwide Class the full amount of damages and liquidated damages available by law;

i. An Order awarding reasonable attorneys' fees and costs incurred by Plaintiff in filing this action as provided by statute;

j. An Order awarding pre- and post-judgment interest to Plaintiff, the FLSA Collective, and the Rule 23 Nationwide Class on these damages; and

k. An Order awarding such other and further relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff, individually and on behalf of all others similarly situated, by and through her attorneys, hereby demands a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the court rules and statutes made and provided with respect to the above-entitled cause.

Respectfully Submitted,

Dated: August 13, 2018

By: _s/Elizabeth A. Hanley_____
Elizabeth A. Hanley, WSBA # 38233
Reed Longyear Malnati & Ahrens, PLLC
801 Second Ave., Ste. 1415
Seattle, WA 98104
Tel. (206) 624-6271
Fax (206) 624-6542
Email: ehanley@reedlongyearlaw.com

SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

Jason J. Thompson (*pro hac vice* forthcoming)
Email: jthompson@sommerspc.com
Rod M. Johnston (*pro hac vice* forthcoming)
Email: rjohnston@sommerspc.com
SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-030
Facsimile: (248) 436-8453

*Counsel for Plaintiff and Proposed Class and Collective Members*

COLLECTIVE CLASS ACTION COMPLAINT AND JURY DEMAND
Page 40 of 40

# EXHIBIT 1

**U.S. Department of Labor**
Wage and Hour Division



(Revised July 2008)

# Fact Sheet #64: Call Centers under the Fair Labor Standards Act (FLSA)

This fact sheet provides general information concerning the application of the FLSA to employees working in call centers.

**Characteristics**

A call center is a central customer service operation where agents (often called customer care specialists or customer service representatives) handle telephone calls for their company or on behalf of a client. Clients may include mail-order catalog houses, telemarketing companies, computer product help desks, banks, financial services and insurance groups, transportation and freight handling firms, hotels, and information technology (IT) companies.

**Coverage**

If the annual dollar volume of a call center's sales or business is $500,000 or more, and the enterprise has at least two employees, all employees of the enterprise are covered by the FLSA on an "enterprise" basis. An enterprise may consist of one establishment, or it may be made up of multiple establishments.

Additionally, the FLSA also provides an "individual employee" basis of coverage. If the gross sales or volume of business done does not meet the requisite dollar volume of $500,000 annually, employees may still be covered if they individually engage in interstate commerce, the production of goods for interstate commerce, or in an occupation closely related and directly essential to such production. Interstate commerce includes such activities as transacting business via interstate telephone calls, the Internet or the U.S. Mail (such as handling insurance claims), ordering or receiving goods from an out-of-state supplier, or handling the accounting or bookkeeping for such activities.

**Requirements**

Covered nonexempt employees are entitled to be paid at least the federal minimum wage as well as overtime at time and one-half their regular rate of pay for all hours worked over 40 in a workweek. (This may not apply to certain executive, administrative, and professional employees, including computer professionals and outside sales, as provided in Regulations 29 CFR 541).

The FLSA requires employers to keep records of wages, hours, and other items, as specified in the recordkeeping regulations. With respect to an employee subject to both minimum wage and overtime provisions, records must be kept as prescribed by Regulations 29 CFR 516. Records required for exempt employees differ from those for non-exempt workers.

The FLSA also contains youth employment provisions regulating the employment of minors under the age of 18 in covered work, as well as recordkeeping requirements. Additional information on the youth employment provisions is available at www.youthrules.dol.gov.

FS 64

**Typical Problems**

Hours Worked:  Covered employees must be paid for all hours worked in a workweek.  In general, "hours worked" includes all time an employee must be on duty, or on the employer's premises or at any other prescribed place of work, from the beginning of the first principal activity of the workday to the end of the last principal activity of the workday.  Also included is any additional time the employee is allowed (i.e., suffered or permitted) to work.  An example of the first principal activity of the day for agents/specialists/representatives working in call centers includes starting the computer to download work instructions, computer applications, and work-related emails.

Rest and Meal Periods:  Rest periods of short duration, usually 20 minutes or less, are common in the industry (and promote employee efficiency), and must be counted as hours worked.  *Bona fide* meal periods (typically 30 minutes or more) generally need not be compensated as work time as long as the employee is relieved from duty for the purpose of eating a regular meal.

Recordkeeping:  A daily and weekly record of all hours worked, including time spent in pre-shift and post-shift job-related activities, must be kept.

Overtime:  Earnings may be determined on an hourly, salary, commission, or some other basis, but in all such cases the overtime pay due must be computed on the basis of the regular hourly rate derived from all such earnings.  This is calculated by dividing the total pay (except for certain statutory exclusions) in any workweek by the total number of hours actually worked.  See Regulations 29 CFR 778.

Salaried Employees:  A salary, by itself, does not exempt employees from the minimum wage or from overtime.  Whether employees are exempt from minimum wage and/or overtime depends on their job duties and responsibilities as well as the salary paid.  Sometimes, in call centers, salaried employees do not meet all the requirements specified by the regulations to be considered as exempt.  Regulations 29 CFR 541 contain a discussion of the requirements for several exemptions under the FLSA (i.e., executive, administrative, and professional employees – including computer professionals, and outside sales persons).

**Where to Obtain Additional Information**

**For additional information, visit our Wage and Hour Division Website: http://www.wagehour.dol.gov and/or call our toll-free information and helpline, available 8 a.m. to 5 p.m. in your time zone, 1-866-4USWAGE (1-866-487-9243).**

This publication is for general information and is not to be considered in the same light as official statements of position contained in the regulations.

| | |
|---|---|
| **U.S. Department of Labor** | **1-866-4-USWAGE** |
| Frances Perkins Building | TTY: 1-866-487-9243 |
| 200 Constitution Avenue, NW | **Contact Us** |
| Washington, DC 20210 | |

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| **VIRGINIA FARLEY,** individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    vs.<br><br>**ADECCO USA, INC.**, and **RESTAURANT REVOLUTION TECHNOLOGIES, INC.,** jointly and severally,<br><br>        Defendants. | **CONSENT TO JOIN FORM** |

I work or worked for Adecco USA, Inc. and Restaurant Revolution Technologies, Inc. (hereinafter "Defendants") as an hourly Virtual Server and worked uncompensated overtime.

I choose to participate in the lawsuit titled *Farley v. Adecco USA, Inc. et al.*, to recover unpaid overtime wages under the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), and other relief under state and federal law.

I choose to be represented in this action by the named plaintiff and Sommers Schwartz, P.C. ("Plaintiffs' Counsel"). I agree to be bound by their decisions in the litigation and by any adjudication of this action by a court, whether it is favorable or unfavorable. I understand that reasonable costs expended by Plaintiffs' Counsel on my behalf will be deducted from any settlement or judgment amount on a pro-rata basis among all other plaintiffs. I understand that Plaintiffs' Counsel will petition the Court to award them attorneys' fees from any settlement or judgment.

Signature: _____

Print Name: virginia farley

Date: 08/09/2018

# EXHIBIT 3

**VIRGINIA FARLEY**

Hand/5121    Wrap/00201    Office/3445

| Pay Group: | P10 | Company: | AUS | Check #: | 52723475 |
|---|---|---|---|---|---|
| Pay Cycle Begin Date: | 02/19/2018 | Employee ID: | 456290 | Check Date: | 03/01/2018 |
| Pay Cycle End Date: | 02/25/2018 | Office: | 3445 Adecco USA Inc | | |
| Customer Service #: | 866/528-0707 | | | | |

**VIRGINIA FARLEY**

| WEEK WORKED | |
|---|---|
| 02/19/18-02/25/18 | |

| TAX DATA: | Federal | FL State |
|---|---|---|
| Marital Status: | Single | N/A |
| Allowances: | 6 | 0 |
| Addl Pct.: | 0 | 0 |
| Addl Amt: | 0 | 0 |

## HOURS AND EARNINGS

| | | -------- Current -------- | | | ---YTD--- | | | |
|---|---|---|---|---|---|---|---|---|
| Week Worked | | Earnings | Rate | Hours | Earnings | Hours | Earnings | Assignment # |
| 02/19/18 | 02/25/18 | OVT | 15.00 | 11.63 | 174.45 | 17.15 | 257.25 | 344511152267 |
| 02/19/18 | 02/25/18 | REG | 10.00 | 40.00 | 400.00 | 322.62 | 3226.20 | 344511152267 |
| | | BIN | | | | 0.00 | 91.80 | |
| Total: | | | | 51.63 | 574.45 | 339.77 | 3575.25 | |

## TAXES

| | Current | YTD |
|---|---|---|
| Description | | |
| Fed Withholdng | 1.42 | 21.16 |
| Fed MED/EE | 8.18 | 50.51 |
| Fed OASDI/EE | 34.98 | 215.97 |
| Total: | 44.58 | 287.64 |

## BEFORE-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| UHC Value Dental Plan | 3.97 | 35.73 |
| Hospital Income Plan | 3.99 | 35.91 |
| UHC Value Vision Plan | 2.25 | 20.25 |
| Total: | 10.21 | 91.89 |

## AFTER-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Aetna Accident | 4.67 | 42.03 |
| Aetna Critical Illness | 6.61 | 59.49 |
| Supplemental Life | 1.49 | 13.41 |
| STD 26 weeks | 2.45 | 22.05 |
| Total: | 15.22 | 136.98 |

## EMPLOYER PAID BENEFITS

| Description | Current | YTD |
|---|---|---|
| *Taxable | 0.00 | 0.00 |
| Description | Accrued Hrs  Hrs Taken  Available  Last Updt | |

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current: | 574.45 | 564.24 | 44.58 | 25.43 | 504.44 |
| YTD: | 3575.25 | 3483.36 | 287.64 | 228.87 | 3058.74 |

| NET PAY DISTRIBUTION | |
|---|---|
| Advice # 52723475 | 504.44 |
| DDP Acct # XXXXX7705 | 504.44 |
| Total: | 504.44 |

**Work Locations**
RESTAURANT
REVOLUTION TECHNOLO
1309 SANTA ANITA ST
ORLANDO
FL 32808-6226
(209)276-092

**Adecco USA Inc**
**175 Broad Hollow Road**
**Melville, NY 117478905**

Verify your name, address and tax data as shown. For changes, submit an updated W4
to your local branch. This information will be used to issue your Year End Wage
Statement.

Adecco USA Inc
6183 Paseo Del Norte
Ste 160
Carlsbad CA 920111153

*NOT A CHECK*
*NON-NEGOTIABLE*

**Advice No. 52723475**
**Date: 03/01/2018**

**Pay**    ****FIVE HUNDRED FOUR DOLLARS AND 44 CENTS****

$504.44************

**To The Order Of**    **VIRGINIA FARLEY**

**EXHIBIT 4**

## Form W-2 Wage and Tax Statement 2017

| Box | Label | Amount |
|---|---|---|
| 7 | Social security tips | |
| 1 | Wages, tips, other compensation | 19608.46 |
| 2 | Federal income tax withheld | 790.72 |
| 8 | Allocated tips | |
| 3 | Social security wages | 19608.46 |
| 4 | Social security tax withheld | 1215.72 |
| 9 | Verification code | |
| 5 | Medicare wages and tips | 19608.46 |
| 6 | Medicare tax withheld | 284.32 |
| 10 | Dependent care benefits | |
| 11 | Nonqualified plans | |
| 12a | See instructions for box 12 | |

c Employer's name, address, and ZIP code
ADECCO USA INC
175 BROAD HOLLOW ROAD
MELVILLE NY 11747-8905

13 Statutory employee / Retirement plan / Third-party sick pay

14 Other

b Employer identification number (EIN)
94-3286700

e Employee's name, address, and ZIP code
VIRGINIA F FARLEY

a Employee's social security number

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

Copy B-To Be Filed With Employee's FEDERAL Tax Return

This information is being furnished to the Internal Revenue Service.
OMB No. 1545-0008

Dept. of the Treasury - IRS
Visit the IRS website at *www.irs.gov/efile*.

---

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

## Form W-2 Wage and Tax Statement 2017

| Box | Label | Amount |
|---|---|---|
| 7 | Social security tips | |
| 1 | Wages, tips, other compensation | 19608.46 |
| 2 | Federal income tax withheld | 790.72 |
| 8 | Allocated tips | |
| 3 | Social security wages | 19608.46 |
| 4 | Social security tax withheld | 1215.72 |
| 9 | Verification code | |
| 5 | Medicare wages and tips | 19608.46 |
| 6 | Medicare tax withheld | 284.32 |
| 10 | Dependent care benefits | |
| 11 | Nonqualified plans | |
| 12a | See instructions for box 12 | |

c Employer's name, address, and ZIP code
ADECCO USA INC
175 BROAD HOLLOW ROAD
MELVILLE NY 11747-8905

13 Statutory employee / Retirement plan / Third-party sick pay

14 Other

b Employer identification number (EIN)
94-3286700

e Employee's name, address, and ZIP code
VIRGINIA F FARLEY

a Employee's social security number

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

Copy C-For EMPLOYEE'S RECORDS (See *Notice to Employee* on the back of Copy B.)   OMB No. 1545-0008

Dept. of the Treasury - IRS
Visit the IRS website at *www.irs.gov/efile*.

---

## Form W-2 Wage and Tax Statement 2017

| Box | Label | Amount |
|---|---|---|
| 7 | Social security tips | |
| 1 | Wages, tips, other compensation | 19608.46 |
| 2 | Federal income tax withheld | 790.72 |
| 8 | Allocated tips | |
| 3 | Social security wages | 19608.46 |
| 4 | Social security tax withheld | 1215.72 |
| 9 | Verification code | |
| 5 | Medicare wages and tips | 19608.46 |
| 6 | Medicare tax withheld | 284.32 |
| 10 | Dependent care benefits | |
| 11 | Nonqualified plans | |
| 12a | | |

c Employer's name, address, and ZIP code
ADECCO USA INC
175 BROAD HOLLOW ROAD
MELVILLE NY 11747-8905

13 Statutory employee / Retirement plan / Third-party sick pay

14 Other

b Employer identification number (EIN)
94-3286700

e Employee's name, address, and ZIP code
VIRGINIA F FARLEY

a Employee's social security number

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

Copy 2-To Be Filed With Employee's State, City, or Local Income Tax Return   OMB No. 1545-0008

Dept. of the Treasury - IRS

---

## Form W-2 Wage and Tax Statement 2017

| Box | Label | Amount |
|---|---|---|
| 7 | Social security tips | |
| 1 | Wages, tips, other compensation | 19608.46 |
| 2 | Federal income tax withheld | 790.72 |
| 8 | Allocated tips | |
| 3 | Social security wages | 19608.46 |
| 4 | Social security tax withheld | 1215.72 |
| 9 | Verification code | |
| 5 | Medicare wages and tips | 19608.46 |
| 6 | Medicare tax withheld | 284.32 |
| 10 | Dependent care benefits | |
| 11 | Nonqualified plans | |
| 12a | | |

c Employer's name, address, and ZIP code
ADECCO USA INC
175 BROAD HOLLOW ROAD
MELVILLE NY 11747-8905

13 Statutory employee / Retirement plan / Third-party sick pay

14 Other

b Employer identification number (EIN)
94-3286700

e Employee's name, address, and ZIP code
VIRGINIA F FARLEY

a Employee's social security number

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

Copy 2-To Be Filed With Employee's State, City, or Local Income Tax Return   OMB No. 1545-0008

Dept. of the Treasury - IRS

FORM # LW28700

# EXHIBIT 5



better work, better life



# Employee Handbook

Adecco Employee Handbook 2016



# Disclaimer

The contents of this handbook are presented as a matter of information only and are not intended to cover all policies, plans and procedures of Adecco. This handbook is not intended to create, nor is it to be construed as, a contract between you and Adecco, nor does it guarantee placement on assignment or that any placement on assignment will be of a definite duration. Employment with Adecco is at-will, which means that employment can be terminated by you or Adecco for any reason or no reason at any time. Your execution of the Acknowledgment of Receipt of the Employee Handbook constitutes acknowledgment, understanding and agreement to comply with the policies, plans and procedures contained herein. Adecco reserves the right to add, terminate, or change any or all policies, plans or procedures of Adecco, in whole or in part, at any time with or without notice.

Unless otherwise stated in this handbook, the contents of this handbook are applicable to temporary employees placed on assignment with a client by Adecco General Staffing, which includes associates and client payrolled employees (CPE), and are referred to throughout this handbook as "employees."  This handbook does not apply to any other type of employee at Adecco including Colleagues. Any references to "employment" in this handbook and/or in other forms you receive from Adecco refer to the periods of time when you perform actual work and earn wages during assignments and not to periods of time between assignments. If you elect to participate in a client interview, such time is not compensable.

Generally, employees are individuals who are eligible for temporary work assignments to support or supplement a client's or Adecco's workforce during time periods of, including but not limited to, employee absences, temporary skill shortages, seasonal workloads, and special long- and short-term assignments and projects.

The information contained in this Employee Handbook is proprietary to Adecco. Nothing in this handbook is intended to violate or supersede applicable law. Should any policy or provision contradict applicable law, that law shall be applied.

Adecco Employee Handbook 2016



# Contents

Welcome to Adecco ........................................................................................3

Assignments............................................................................................... 4-6

Standard time recording procedures ...................................................... 7-8

The Electronic Pay program..................................................................... 9-10

Contact policy.................................................................................................11

Benefits ..................................................................................................... 12-15

Family and Medical Leave Act ............................................................... 16-21

Safety is everyone's priority ......................................................................22

Workers' Compensation ..............................................................................22

Injuries on the job.........................................................................................23

Unemployment Compensation Insurance ................................................24

EEO/Diversity statement .............................................................................25

Americans with Disabilities Act............................................................. 25-26

Anti-harassment and Anti-discrimination policy................................. 26-28

Dress and grooming policy .........................................................................29

Open door policy ..........................................................................................29

Substance abuse policy ......................................................................... 30-32

Workplace search policy .............................................................................32

Privacy policy .......................................................................................... 33-34

Code of Business Conduct...........................................................................34

Workplace Violence......................................................................................35

Employment and income verification.................................................... 36-37

Who to contact ........................................................................................ 38-41

Adecco Employee Handbook 2016



# Welcome to Adecco

Congratulations! You are now part of the nation's leading workforce solutions company. Adecco is much more than a recruiting and placement company. We are committed to helping you fulfill your professional goals at every stage of your career. Along the way, we hope to present you with challenging and rewarding opportunities at top companies, help you earn a competitive income, and provide you with the latest skill-enhancement services and access to a full range of benefits.

At Adecco, we know just how hard you work and how much time you spend in the workplace. That's why we want to make sure you have the right position at the right company. It's no wonder top candidates keep coming back to Adecco for help in finding a job or managing their career.

This handbook was specifically designed to prepare you for your assignments. It provides contact information and examples of when you should contact Adecco, some benefits information, and communicates many of Adecco's policies and procedures. Be sure to visit the AdeccoUSA.com website for future updates to this handbook and other exciting features.

Please note that certain Adecco-branded locations are franchised locations.  These locations may deviate from some of the policies, procedures, and information contained herein.  Thus, a representative at these locations should be contacted for information regarding these locations. Currently franchised locations are as follows: Ann Arbor, MI; Normal, IL; Champaign, IL; Corpus Christi, TX; Fort Wayne, IN; Lafayette, IN; LaGrange, GA; Lawrence, KS; Macon, GA; New Braunfels, TX; San Antonio, TX;; Tallahassee, FL; Topeka, KS and Wichita, KS.

So, welcome aboard — we wish you every success.

Adecco Employee Handbook 2016



# Assignments

At Adecco, we pride ourselves on making the right "matches" — matching your job preferences and skill level with our clients' needs. You are required to update your availability for work regularly. Once you have notified Adecco of your availability, we will contact you if we have an assignment that matches your skills, experience and qualifications. We must have an email address and/or a working telephone number where we can reach you or leave a message.

When you accept an assignment, you will be making a commitment that you will work for the duration of the assignment.

**To prepare you for starting a new assignment, please make sure you have:**

- The client company's name
- The location, hours and anticipated length of assignment
- The specific tasks you will be doing
- The hourly rate or salary, as applicable
- The name of the person to whom you report
- Any other details that will help you on your assignment

If you are going to be late for your assignment or have any emergency or illness that prevents you from going to work, you must first and foremost contact your Adecco Representative prior to the start of the assignment. Adecco will call the client and explain the situation. Client policies might contain additional requirements that should also be followed.

All of our offices have 24-hour answering services and email so you can leave/send a message at any time — day or night. Failing to call us prior to the start of the assignment when you are late or when you cannot go to an assignment may result in disciplinary action up to and including a voluntary quit and/or termination.

4

Adecco Employee Handbook 2016



# Assignments

**Your wages**

Unless you are notified otherwise, you will be paid an hourly wage for each assignment, determined by the assignment requirements, your skills, and the wage rates in your local area. For this reason, your wage rate may vary from job to job. Your Adecco Representative will tell you how much each assignment will pay before you accept an assignment. Furthermore, the legal name of your Adecco employer and the wage rate(s) applicable to your assignment(s) will appear on the itemized statement issued with your wages.

**Taxes**

Adecco will deduct those taxes required by law from your pay — i.e. Federal, State, and City withholding taxes as well as Social Security and Medicare taxes. Adecco pays certain employer taxes such as Unemployment Insurance Tax and Social Security Tax, and you will be covered by Workers' Compensation Insurance. We provide you a W-2 Wage and Tax Statement to you by January 31st of the following year. Please inform your Adecco Representative of any address changes immediately to ensure accurate W4 information and timely delivery of your W-2 form.

**While on assignment:**

- Arrive on time each day of your assignment.

- Follow Adecco's dress and grooming policy. Your Adecco Representative will tell you what to expect, but when in doubt always dress more conservatively.

- Follow and comply with the rules, policies, procedures, and working conditions established by Adecco's clients for their premises.

- Promptly bring any and all complaints or disputes about your assignment or working conditions to your Adecco Representative and/or the HUB (800.793.7657 option 6 or thehub@adeccona.com).

- Promptly bring any and all questions or disputes about your pay to the Payroll Shared Services Center (866.528.0707) unless instructed otherwise by your Adecco Representative.

Adecco Employee Handbook 2016



# Assignments

- Behave in a professional manner. This means that your personal conduct, including conversations in the workplace, must not violate Adecco policies including, but not limited to, Adecco's Anti-harassment policy contained in this handbook. You must also refrain from threatening action, conduct or language.

- During working hours, avoid making personal calls, using personal cell phones/electronic equipment to send emails, or using other personal electronic communications, except in case of an emergency.

- If you have any questions regarding your current assignment's work hours, overtime, meal and/or rest periods, please contact your Adecco Representative.

- Your employment with Adecco requires you to comply with our policies and procedures and those of Adecco's clients for which you are working. Failure to comply with these policies and procedures may result in disciplinary action up to and including termination.

- Your employment with Adecco is at-will and may be terminated at any time.

- Follow the time submittal procedures described in the handbook or provided to you by your Adecco Representative to ensure we have the information required to pay you.

- Obtain advance approval from your Adecco Representative to perform work during overtime hours. Anytime you work overtime, you are required to report those hours to Adecco when you submit your hours worked.

- Do not be afraid to ask questions on the job about the tasks you are performing. If you are unsure of something, check with the client representative.

- Do not approach the client about full-time employment. If you have an interest in a position; let your Adecco Representative know.

Adecco Employee Handbook 2016



# Standard time recording procedures

Although you may be doing work for a variety of Adecco's clients, Adecco is your employer while you are on assignment. Your timecard and pay check are processed by Adecco. Unless otherwise notified by your Adecco Representative, the Payroll Shared Services Center is your contact for all time recording and payroll related questions (see exceptions below*). They are there to answer your questions or to help solve any payroll problems that might arise.

*Always contact your local Adecco Representative if you work in the following cities: Ann Arbor, MI; Normal, IL; Champaign, IL; Corpus Christi, TX; Fort Wayne, IN; Lafayette, IN; LaGrange, GA; Lawrence, KS; Macon, GA; New Braunfels, TX; San Antonio, TX; Tallahassee, FL; Topeka, KS; Wichita, KS.  These locations are franchised locations and may have differing policies or procedures.

Instructions for recording your time worked:

- At the end of your work week, you must record your time for **all** hours worked, including any overtime. Prior to each assignment, always check with your Adecco Representative whether overtime work requires pre-approval and adhere to such guidelines to the extent possible.  Always promptly report all time worked.

- It is your responsibility to record your time fully and accurately before submitting it to the client representative for approval. When required, you should record the in/out time or total time attributed to your work day and your meal period(s).

- If you are not being provided a meal or rest break to which you are entitled under applicable law, advise your Adecco Representative or the HUB immediately.

- In order to ensure that your pay check is accurate, you must promptly record your time completely and without errors using one of our convenient time entry methods.

Adecco Employee Handbook 2016



# Standard time recording procedures

**Additional information:**

Adecco uses various methods to record your work time depending on your assignment. **Please confirm the time recording procedures applicable to your assignment(s) with your Adecco Representative**.

*Two common methods of recording your work time are listed below:*

1. **Entering hours via the internet**

   Hours must be entered via the internet by Sunday at midnight by typing www.webtime.mypeoplenet.com into your internet browser. The first time you use the system, you will register as a new user using the last 4 digits of your social security number. Once you have created a logon and password you will follow instructions provided to record your time weekly.

2. **Entering hours via the telephone**

   Your Adecco Representative will let you know if this is an option to report hours while on an assignment.  You will need the last 4 digits of your social security number and assignment number (obtained from your Adecco Representative). Follow the automated instructions provided by dialing 1.888.481.1761.

**Time approval procedures**

It is your responsibility to obtain client approval of your work time.

- If Adecco's client approves your weekly hours electronically, please make sure your hours are entered into one of the above listed time recording methods by Sunday at midnight. For questions, contact the Payroll Shared Services Center, 866.528.0707 unless instructed otherwise by your Adecco Representative.

- If Adecco's client requires that they approve your hours by signing a paper timesheet weekly, please make sure you print out a timesheet, have your client supervisor sign it, then fax your timesheet directly to the fax number provided on the timesheet after submitting your time electronically. For questions, contact the Payroll Shared Services Center, 866.528.0707 unless instructed otherwise by your Adecco Representative.

8

Adecco Employee Handbook 2016



# The Electronic Pay Program

Electronic delivery of employees' weekly payment and pay stubs.

**Weekly pay options**

Adecco pays employees electronically by Direct Deposit to a personal banking account or the Bank of America/ Money Network program. Your Adecco Representative will provide you with an Electronic Pay Authorization Form during your on boarding to select your preferred banking method. You may update your Electronic Pay Authorization Form at any time if needed.

**Direct deposit**

When on assignment your regular payday is Friday. Funds will be deposited into the bank account of your choice. It is your responsibility to contact your bank to verify funds were deposited to your account prior to using the funds. Adecco will not be responsible for overdrafts on your account.

**Bank of America/Money Network**

You will receive a welcome package. It will include:
- A card to access funds Checks with cashing instructions
- Tips for using the  account

It is your responsibility to contact Bank of America/Money Network to update your address should it change after enrollment. You may receive the welcome packet and card prior to being placed on an assignment. Please put this card in a safe place as this account will be funded on pay day when you are on assignment.

For additional pay options, contact your local Adecco Representative if you work in the following cities: Ann Arbor, MI; Normal, IL; Champaign, IL; Corpus Christi, TX; Fort Wayne, IN; Lafayette, IN; LaGrange, GA; Lawrence, KS; Macon, GA; New Braunfels, TX; San Antonio, TX; Tallahassee, FL; Topeka, KS; Wichita KS.

Adecco Employee Handbook 2016



---

# The Electronic Pay Program

**Pay stub/advice:**

**Adecco delivers card pay stubs electronically via web, phone or fax.**
- View your pay advice on-line or print a copy by logging on to the electronic pay stubs website at http://paperlesspay.talx.com/adecco
  OR
- You may receive this information by calling toll free 1.800.978.3729.

Where permitted by state law employees will automatically be enrolled in the electronic pay stub program. All other employees are encouraged to voluntarily enroll in this program.

**Payroll Text Program:**

Adecco provides the opportunity for you to receive your most recent pay information via text.  Get up–to-date information about your pay check by sending a text message to 904.323.3430 with the last four digits of your (SSN) Social Security Number along with your zip code.

> For example: if your last four numbers of your SSN are "1234" and your zip code is "56789" you would text "123456789."

After texting the service, you'll receive a message with your most recent check information.  Please note that standard text messaging rates apply.

# W2 Information

You can register and consent for quick electronic delivery or reprint your W2 at https://w2.edelivery-view.com/.  An email will be sent when your W2 is available. Otherwise, Adecco sends your W2's to your listed mailing address by January 31st.

Adecco Employee Handbook 2016



# Contact Policy

It is Adecco's policy that you provide your personal contact information, availability for work, and inform Adecco of any changes/issues regarding your assignment at a client. Furthermore, throughout this Employee Handbook we have incorporated information and instances as to when you are required to contact Adecco and a "Who to contact" resource section can be found at the end of this Handbook.

Upon conclusion of each assignment, you must promptly contact your Adecco Representative by telephone (between the hours of 9am and 5pm).

Your representative's contact information is provided on the Mandatory Contact Notice which is one of the documents you signed when you were accepted by Adecco. If your representative is not available, please ask to speak with another Adecco Representative or the Adecco Branch Manager.

- Failure to contact Adecco by phone within two business days[1] of completion of assignment may lead to the denial and/or interruption of unemployment benefits.

- If you fail to inquire about another assignment before filing for unemployment benefits, it may lead to an interruption and/or denial of unemployment benefits.

- If a suitable assignment is available with Adecco upon conclusion of your assignment and you refuse an offer of suitable work, it may lead to an interruption and/or denial of unemployment benefits.

Employees should not contact Adecco's clients directly, unless expressly directed to do so by an Adecco Representative. Upon conclusion of your assignment, your Adecco Representative will arrange for the return of any personal items that may remain at the client site and for the return of any client issued IDs, badges, etc. Direct any questions regarding the reasons for the assignment's completion to Adecco, not the client.

Failure to adhere to this policy for any reason may result in disciplinary action up to and including a voluntary quit or termination.

1 **Exceptions to the two business day notification period are listed below:**

Iowa – Employees must contact Adecco within three working days of completion of the temporary assignment.

Michigan – Employees must contact Adecco within seven working days of completion of the temporary assignment.

Minnesota – Employees must contact Adecco within five working days of completion of the temporary assignment

Adecco Employee Handbook 2016



better work, better life

---

# Benefits

Adecco knows the importance of creating a work environment that fosters a healthy work/life balance and shows employees they are valued. That's why we provide employees with access to a variety of benefits, including:

- Group benefits —health, dental, vision, life insurance, disability
- 401(k) Plan
- Tuition reimbursement
- Training programs
- Paid holidays

A brief introduction to most of the listed benefits can be found below. For additional details on these programs, please contact your Adecco Representative or the Employee Benefits Department at 866.664.6420 Monday – Friday 8am-9pm EST.

**Group benefits**

The Group Benefits program offers a full line of benefit plan options including: health, dental, vision, term life insurance and short-term disability insurance.  Log on to the benefits website to review the benefit guide at www.mybenefitharbor.com/adecco for further details.

Adecco Employee Handbook 2016



# Benefits

**Enrollment and eligibility for group benefits**
ACA Status
The status of an associate will be determined at the Customer or Work Location level by operations in advance of a placement.

Definition of each ACA status
Variable – Initial assignment is expected to average less than 30 hours per week AND/OR length of assignment is less than 20 weeks.
Non-Variable – Initial assignment is expected to average 30 or greater hours per week AND length of assignment is greater than 20 weeks.

Look Back Period – Once a Variable associate has worked for 11 months, our system will analyse the associate's hours paid to determine if they meet the Non-Variable definition. If so, the associate will be offered the Medsure plan and will have 60 days to enroll.

Newly eligible benefits become effective the first of the month after:
Variable- 30 day waiting period
Non Variable- 60 day waiting period

You must complete your online enrollment by your benefit effective date.

 If you miss the enrollment period, you will not be permitted to enroll until the next Annual Enrollment period, which is typically held in the Fall, or
until you experience a qualifying life event (i.e. marriage, birth, divorce, death – see plan documents for more information). To enroll in any of the Group Benefits call 866.664.6420 Monday – Friday 8am -9pm EST or go to www.mybenefitharbor.com/adecco. Important and detailed plan information can also be found on the above mentioned website such as a copy of your Summary Plan Description (SPD), HIPAA Privacy Notice; Medicare Part D Credible Coverage Notices; Summary Annual Report (SAR); Notice of Special Enrollment Rights and detail information about the Voluntary Benefits insurances including limits and exclusions.

**The Adecco, Inc. Associates 401(k) Plan**

The Adecco, Inc. Associates 401(k) Plan offers you an easy way to save for retirement through pre-tax payroll deductions.  The amount of money that you may contribute is 1%-75% of your weekly gross pay, up to the IRS maximum annual deferral limit.[1]

Adecco Employee Handbook 2016



Full-time and part-time employees are eligible to enroll as soon as administratively possible, usually about two weeks following your first paycheck.

Please send an email to 401k@adeccona.com to request enrollment information or complete the Request for Enrollment Information form provided to you by your Adecco Representative.  Please allow at least two weeks for your 401(k) account to be setup at Wells Fargo.

If you have any questions, please send an e-mail to 401k@adeccona.com or call 1.877.632.9169.

1.   If you are identified as a Highly Compensated Employee (you earned at least $120,000 working for Adecco or an affiliate company in 2015), your Regular contributions for 2016 will be limited to 10% of gross pay.

# Benefits

## Tuition reimbursement

You may be eligible for tuition reimbursement of up to 50% of the cost of the course and books not to exceed $100 per course when you complete specialized, work-related courses and meet the following criteria:

- Receive written approval from your Adecco Representative prior to enrollment.
- After successful completion of the course, certificate of completion or proof of a grade of "C" or better and all receipts for tuition and books to your Adecco Representative.
- Work 120 hours for Adecco within 12 months after you complete each course.

## Adecco SkillBuilder training program

Adecco SkillBuilder is a web-based application giving you access to thousands of training and skill upgrade courses. Best of all, these courses are free.

Use this training to keep your skills current, prepare for specific job assignments, prepare for certification exams, or keep your professional certification current. This may all contribute to more job assignment opportunities for you at no cost to you!  Each course you take is valued at hundreds of dollars on the open market but Adecco has secured free access for its employees.

Adecco Employee Handbook 2016



These courses are deployed online so that you may proceed at your own pace and at your convenience. Your Adecco Representative may assign specific courses to you, but you may also search and select additional courses that will be beneficial to your career. You may also be interested in one of our Adecco Workforce Readiness Certification programs, also delivered via Adecco SkillBuilder.  If you have a valid email address attached to your record, and are a qualified, available or working Associate, you will automatically be registered to use the training programs, and will receive an email with your user name and password.  Be sure to look for it in your email inbox.  Ask your Adecco Representative for more information on these free courses and how they can benefit you.

**Holiday pay**

Adecco provides qualifying employees with a holiday pay benefit if Adecco determines, in its sole discretion, that its financial performance goals are met. Some client payrolled employees (CPEs) are not eligible for this benefit — CPEs should verify their eligibility with their Adecco Representative.

**Holiday pay[1]**

Based upon your hours worked and your availability for work, you may qualify for holiday pay for Presidents' Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, and either Christmas Day or New Year's Day (of the following year). When a holiday benefit is generally payable, you will qualify to receive the benefit if you have worked at least 1000 hours for Adecco in the 26 weeks ending on the Sunday just before the holiday. Only up to the first 40 hours per week based on Adecco's standard Monday to Sunday workweek will be counted for each of those 26 weeks and holiday hours are excluded.

---

[1] If Adecco's financial performance goals are not met (as determined by Adecco in its sole discretion), eligible employees may receive partial holiday pay, or possibly no payment under this benefit program. In addition to its other rights, Adecco reserves the right to modify, add, revoke, suspend, terminate or change these benefits for all or certain categories of employees, and/or for all or individual holidays at any time with or without notice.

15

Adecco Employee Handbook 2016



# Family Medical Leave Act

You may be entitled to leave under the Federal Family and Medical Leave Act (FMLA) for specified reasons covered by the FMLA. Although leave under the FMLA is unpaid, FMLA may run concurrently with a paid or partially paid Short Term Disability or Worker Compensation benefit. In the event an individual state law provides for a more generous benefit or an additional benefit, Adecco shall adjust its FMLA policy to comply with the state law. The following is Adecco's FMLA policy for employees.

## Family Medical Leave Act

**FMLA eligibility**

To be eligible for FMLA leave, you must:

- have been employed by Adecco for at least 12 months; and

- have worked at least 1,250 hours (all actual hours worked) during the 12 month period immediately preceding the beginning of the leave

**Basic Leave Entitlement**

Eligible employees may take up to 12 weeks of unpaid, job protected leave during a 12 month period. A "rolling" 12 month period measured backward from the date an employee uses any FMLA leave, will be used to determine eligibility for FMLA.

Leave may be taken for one or more of the following reasons:

- For incapacity due to pregnancy and/or prenatal medical care
- For the birth and care of a new-born child of the employee, or placement with the employee of a child for adoption or foster care
- To care for employee's spouse, child, or parent, who has a serious health condition
- For a serious health condition that makes the employee unable to perform the functions of the employee's job
- To care for an injured or ill service member that is the employee's spouse, son, daughter, parent, or next-of-kin (up to 26 weeks in a 12 month period allowed (see below).

Adecco Employee Handbook 2016



- Because of any qualifying exigency arising out of the fact that a spouse, son, daughter, or employee is on covered active duty (or has been notified of an impending call or order to covered active duty) in the Armed Forces.

If both spouses work for Adecco, they are jointly entitled to a combined total of 12 weeks of family leave for the birth or placement of a child for adoption or foster care, and/or to care for a parent with a serious health condition, or up to a total of 26 weeks in a case involving leave to care for a covered service member (see below). If the leave is to care for a child or spouse with a serious health condition or for the employee's own serious health condition, separate 12 week periods are available.

## Military Family Leave Entitlements

Eligible employees with a qualifying exigency arising out of the fact that a spouse, son, daughter, or employee is on covered active duty (or has been notified of an impending call or order to covered active duty) in the Armed Forces may use their 12-week entitlement to address certain qualifying exigencies. Qualifying exigencies may include attending certain military events, arranging for alternative childcare, addressing certain financial and legal arrangements, attending certain counselling sessions, and attending post-deployment reintegration briefings.

FMLA also includes a special leave entitlement that permits eligible employees to take up to 26 weeks of leave to care for a covered service member during a single 12 month period under certain circumstances. A covered service member is:

(A) a member of the Armed Forces (including a member of the National Guard or Reserves) who is undergoing medical treatment, recuperation, or therapy, is otherwise in outpatient status, or is otherwise on the temporary disability retired list, for a serious injury of illness; or

(B) a veteran who is undergoing medical treatment, recuperation, or therapy, for a serious injury or illness and who was a member of the Armed Forces (including a member of the National Guard or Reserves) at any time during the period of 5 years preceding the date on which the veteran undergoes that medical treatment, recuperation, or therapy.

## Intermittent or Reduced Work Schedule Leave

Employees may not be required to use FMLA in one block of time. Eligible employees are able to take FMLA leave intermittently (which means taking leave in more than one block of time) or on a reduced work schedule when medically necessary for any of the

Adecco Employee Handbook 2016



following reasons:

- Employee's or qualifying family member's serious health condition when the leave is medically necessary

- Covered service member's serious injury or illness when the leave is medically necessary

- For a qualifying exigency arising out of a covered service member's active duty status

Employees must inform their Adecco Representative and the Leave Administrator each time they are late or absent as it relates to an intermittent FMLA.  Delay in reporting the absence may result in FMLA denial. If an Employee needs leave intermittently or on a reduced leave schedule for planned medical treatment, then the Employee must make a reasonable effort to schedule the treatment so as not to disrupt unduly Adecco's and/or Adecco's client's operations.

An employee who requests intermittent leave or reduced hours may be required to temporarily transfer to an alternative position for which they are qualified. This alternative position will provide equivalent pay and benefits, and will better accommodate recurring periods of leave than the regular position.

Intermittent or reduced schedule FMLA leave after the birth of a healthy child or placement of a healthy child for adoption or foster care is only permitted with Adecco's preapproval.  Preapproval is not required, however, for leave during which the expectant mother has a serious health condition in connection with the birth of her child or if the new-born child has a serious health condition.

**Notice requirements**

Employees must provide Adecco and its Leave Administrator at least 30 days advance notice before FMLA leave is to begin if the need for the leave is foreseeable based on an expected birth, placement for adoption or foster care, planned medical treatment for a serious health condition of the employee or of a family member, or the planned medical treatment for a serious injury or illness of a covered service member.

Adecco's Leave Administrator must be contacted at the number listed below:

Leave Administrator: The Hartford, 1.866.689.5707

If 30 day notice is not possible, such as because of a lack of knowledge of approximately when leave will be required to begin, a change in circumstances, or a

Adecco Employee Handbook 2016



medical emergency, notice must be given as soon as reasonably possible, generally within one to two business days of when the need for leave becomes known to the employee. Provide notice by either requesting FMLA leave specifically, or explaining the reasons for leave so as to allow Adecco to determine that the leave is FMLA-qualifying. Calling in "sick" without providing the reasons for the needed leave may not be considered sufficient notice for FMLA leave under this policy. Employees must respond to Adecco and/or the Leave Administrator's questions to determine if absence is potentially FMLA qualifying. If employees fail to explain the reasons for FMLA leave, the leave may be denied.

Employees who fail to give 30 days notice for foreseeable leave without a reasonable excuse for the delay, or otherwise fail to satisfy FMLA notice obligations, may have FMLA leave delayed or denied.

**Certification requirements —**
**Employees seeking FMLA are required to provide:**

- Medical certification supporting the need for leave due to a serious health condition of the employee or spouse, child or parent including the reason for and probable duration of the leave (including intermittent or reduced leave schedule). This certification must be submitted within 15 days of the request for leave, unless it is not reasonably possible under the particular circumstances to do so despite the employee's diligent, good faith efforts.

- If requested by Adecco, second or third medical opinions and periodic certifications may be required

- Certification of the date of birth, adoption or placement of child supporting the need for leave due to birth or placement of a child for adoption or foster care

**Notice of eligibility for, and designation of, FMLA Leave**

Employees requesting FMLA leave shall receive written notice from the Leave Administrator advising them whether they are eligible for FMLA leave and, if not eligible, the reasons why they are not eligible. When eligible for FMLA leave, employees shall receive written notice from the Leave Administrator of: 1) their rights and responsibilities in connection with such leave; 2) Adecco's designation of leave as FMLA qualifying or non-qualifying, if not FMLA qualifying, the reasons why; and 3) the amount of leave, if known, that will be counted toward the employee's leave entitlement.

In some situations, Adecco may retroactively designate leave as FMLA leave with appropriate written notice to employees. In all cases where leaves qualify for FMLA protections, Adecco and employee can mutually agree that the leave be retroactively

Adecco Employee Handbook 2016



designated as FMLA leave.

**Return to work certification**

An employee returning to work from FMLA leave that was taken because of their own serious health condition that made them unable to perform the job must provide the Leave Administrator the medical certification from a health care provider confirming ability to return to work and to perform the essential functions of the employee's position, with or without reasonable accommodation. Adecco may delay and/or deny job reinstatement until the employee provides return to work/fitness for duty certification.

**Job reinstatement**

Generally, on return from FMLA, employees are entitled to be returned to the same or equivalent position held when leave commenced. However, if the employee would not otherwise have been working at the time that reinstatement is requested, Adecco may not be able to reinstate the employee following the leave. For example, if the employee's position would have been eliminated or the assignment ended the employee will not be reinstated.

If an employee is not medically able to or otherwise does not return to work at the end of the 12 week leave period, the employee's position may be filled permanently and employment may be subject to termination. In such cases, employees can contact their Adecco Representative upon receiving a subsequent medical release to return to work and apply for any open position for which the employee is qualified.

**Statutory state disability programs**

Some states may provide state disability if you are unable to work because your physician has assessed that you are no longer able to perform your essential job duties based on your disability. To find out about your state disability program and if you qualify, contact your state agency for the state sponsored programs. Employees working in NY must contact The Hartford at 1.866.689.5707.

Adecco Employee Handbook 2016



# Family Medical Leave Act

## Pregnancy Disability Leave Of Absence (California only)

Employees in the State of California may be eligible to take a leave of absence up to 4 months for disabilities relating to pregnancy, childbirth or related medical conditions. To determine eligibility and open a claim, contact Sedgwick, the Leave Administrator at 1.800.735.7836. The exact duration of the leave will be determined by the amount of time the employee is actually disabled. Generally, when an employee is able to return to assignment you are entitled to be returned to the same or equivalent position held when leave commenced. However, if you would not otherwise have been working at the time that you request reinstatement, Adecco may not reinstate you following the leave. For example, if your position would have been eliminated or the assignment ended, or the position no longer meets the client's needs during a leave, you will not be reinstated.

Upon the advice of your health care provider, you may also be entitled to reasonable accommodation, to the extent required by law, for conditions related to pregnancy, childbirth or related medical conditions. You should promptly notify your Adecco Representative of the need for a reasonable accommodation. If you are affected by pregnancy or a related medical condition, please notify the Leave Administrator and your Adecco Representative as soon as reasonably possible as Adecco cannot provide you with reasonable accommodations unless it knows of the need for such accommodation.

Prior to the start of the leave or as soon as practicable, generally within one to two business days of when the need for leave becomes known to you, the Leave Administrator will require a statement from your health care provider indicating that you are unable to perform your job and the anticipated date of your return. In the event your leave exceeds the anticipated date of return, it is your responsibility to provide further verification from your health care provider that you are unable to perform your job and the revised anticipated date of return to Adecco and the Leave Administrator.

Depending on your eligibility, medical insurance may be continued during the leave in accordance with the applicable plan document, COBRA, or provisions of federal/state law relating to unpaid medical leave.

Adecco Employee Handbook 2016



# Safety is everyone's priority

Always exercise due care while working for Adecco. Most accidents can be prevented with proper caution — whether in an office or industrial environment. All unsafe working conditions must be reported immediately to your Adecco Representative. Make safety a priority in the work environment.

**Call Adecco immediately:**

- If you believe that your working conditions are unsafe
- If you are injured while on assignment or if a near miss occurs
- If you are asked to perform work which was not part of your initial job description such as:
    - lifting over 50 lbs. without assistance
    - performing tasks at heights greater than 8 feet
    - operating motorized equipment
    - operating heavy machinery
    - working in confined spaces
    - assigned a duty where you are asked to wear a respirator

Become familiar with each client's safety procedures and equipment.

# Workers' Compensation

Workers' Compensation is defined by a set of rules determined by each state which outlines benefits to employees who have sustained work-related injuries/illnesses within the course and scope of their employment. The laws provide for payment of medical bills for treatment related to work injuries and illnesses, as well as provides statutory wage benefits for employees who lose time from work. Fraudulent Workers' Compensation claims will be prosecuted to the fullest extent of the law and may result in denial of benefits.

Adecco Employee Handbook 2016



# Injuries on the job

Should you be injured on the job, follow the Adecco process for workplace injuries below:

**Your responsibilities**

- Notify your Adecco Representative immediately, by phone or in person.
    - Obtain the name of the designated clinic; for evaluation and post-accident drug testing, if permitted by state law.
    - You may jeopardize your benefits if initially treated by any other doctor, depending on your state's rules.
- If the physician indicates you cannot return to your regular job, notify your Adecco Representative immediately.
- Contact your Adecco Representative after each medical appointment to report on your progress.
- Provide a medical release form to your Adecco Representative prior to returning to work.
- Participate in the Adecco STEP Program to facilitate your early return to work.
    - The Structured Transitional Employment Program (STEP) provides modified duty in the Adecco branch office or at a non-profit for employees injured on the job with restrictions outlined by an authorized physician.
    - This program is designed to help transition injured workers from modified duty to full duty status while they are healing.
    - Adecco's policy is to get injured employees back to work subject to their current physical capabilities, as soon as the doctor permits.

It is your responsibility to return to work as soon as your doctor provides full or partial release to do so. If you fail to return to work (on either partial or full duty as allowed by your doctor) you may be subject to disciplinary action up to and including termination.

Adecco Employee Handbook 2016



# Unemployment Compensation Insurance

Unemployment compensation insurance is a state government sponsored temporary financial benefit to employees who have lost their jobs due to no fault of their own. The amount of the benefit is based on past work and earnings. Each state has its own set of rules which outline eligibility criteria and benefit amount, and Adecco complies with the state laws. Eligibility is determined by each state's unemployment agency. Funds to cover the costs of unemployment insurance benefits are paid by employers such as Adecco.

**Your responsibilities**

- Contact your Adecco Representative within 48 hours of your assignment ending or your resignation from assignment unless this policy is inconsistent with your state's Unemployment Compensation laws.[1]

- Failure to contact Adecco at the end of your assignment or within 48 hours (or as otherwise notified by Adecco) may result in a voluntary quit and/or the loss of unemployment benefits.

1. State exceptions to the two business day notification period are listed below:
   Iowa – Employees must contact Adecco within three working days of completion of the temporary assignment.
   Michigan – Employees must contact Adecco within seven working days of completion of the temporary assignment.
   Minnesota – Employees must contact Adecco within five working days of completion of the temporary assignment.

**Adecco's responsibilities**

- Will notify its third party claims administrator of the reason for the end of your assignment and provide documentation as needed

- Respond to claim forms and requests for information from each State through our third party claims administrator

Adecco Employee Handbook 2016



# EEO/Diversity statement

Adecco is firmly committed to creating a climate where the different perspectives that diversity brings to its business are valued. Attracting and developing a diverse workforce that reflects the communities we serve is at the foundation of this goal. Viewing diversity as an asset is essential to cultivating a workforce that reflects the changing face of the United States.

Adecco is an equal opportunity employer, and it is a continuing policy of Adecco to afford equal employment opportunities in all aspects of employment (including but not limited to job selection, hiring, promotion, termination, compensation, training, and benefits) to all individuals without regard to sex (including pregnancy), race, color, religion, gender, national origin, sexual orientation, gender identity, marital status, age, disability, veteran status, active military status, genetic tests and information, an individual's status as a domestic violence victim, or any other characteristic protected by applicable law.

Employment decisions will be based on the principles of equal employment opportunity and with the intent to further Adecco's commitment to diversity. All applicants for employment and employees of Adecco may exercise their rights under this policy or Federal, State or local laws at any time.

## Uniformed Services Employment and Reemployment Rights Act (USERRA)

Adecco respects and appreciates all who serve and have served their country in the uniformed services.  Accordingly, Adecco does not permit discrimination, harassment, or retaliation against any person on the basis of past military service, current military obligations, or an intent to serve.  In addition, service members may have certain reinstatement and health insurance continuation rights. For more information on USERRA or other applicable local and state law, please contact the HUB.

# Americans with Disabilities Act

To comply with the applicable laws ensuring equal employment opportunities to qualified individuals with disabilities, Adecco will provide reasonable accommodation to individuals with a known physical or mental disability, if such accommodation would not impose an undue hardship and would enable the individual to apply for, or perform, the essential functions of the assignment in question. Any applicant or employee who requires an accommodation in order to perform the essential functions of the job should contact their Adecco Representative and/or the HUB and request such an

Adecco Employee Handbook 2016



accommodation. The individual should specify what accommodation is needed, if possible. If it will not impose an undue hardship, an accommodation will be made or an alternative accommodation will be proposed.

# Anti-harassment and Anti-discrimination policy

Adecco promotes a workplace that is free of harassment and discrimination based on sex, race, color, religion, gender, national origin, sexual orientation, pregnancy, gender identity, marital status, age, disability, veteran status, active military status, genetic tests and information or an individual's status as a domestic violence victim, or any other applicable legally protected status. Any such harassment and discrimination are prohibited and a violation of Adecco policy. They will not be tolerated in the workplace by anyone, including supervisors, co-workers or non-employees. Any retaliation against someone reporting harassment or discrimination or individuals cooperating with an investigation is also prohibited and will not be tolerated. For purposes of this policy, "workplace" includes, but is not limited to, Adecco work sites, client sites, Adecco/client sponsored social events, employee gatherings, and work-related travel.

**Harassment definition**

In general, harassment means persistent and unwelcome conduct or actions based on a legally protected characteristic or activity. Sexual harassment is one type of harassment and includes unwelcome sexual advances, unwelcome physical contact of a sexual nature or unwelcome verbal or physical conduct of a sexual nature. It does not refer to compliments of a socially acceptable nature.

**Unwelcome verbal or physical conduct of a sexual nature includes, but is not limited to:**

- Unwelcomed touching
- The display of offensive sexually graphic materials
- "Quid Pro Quo" offers of employment perks or threats of adverse employment decisions conditioned upon sexual favors

**Harassment on any basis (race, sex, age, disability, etc.) exists whenever:**

- There is a repeated making of unsolicited, inappropriate gestures or comments.
- The conduct unreasonably interferes with an employee's work or creates an intimidating, hostile, or offensive work environment
- Verbal conduct such as epithets, derogatory jokes, comments or slurs based on

Adecco Employee Handbook 2016



a protected characteristic, whether made verbally, in writing, electronically, or communicated in any other manner.

**Obligation to report**

In order to take appropriate corrective action, Adecco must be sufficiently aware of the harassment, discrimination, or retaliation. Therefore, if you have experienced or witnessed harassment, discrimination, or retaliation stated above, you must promptly report such behavior to the HUB at 800-793-7657 option 6 or thehub@adeccona.com. Complaints may be made verbally or in writing.  If you believe you cannot contact the HUB regarding the issue, you may contact the ACE Hotline at 800-279-6315 or via the web at www.aceconduct.com.  The ACE line and website are operated by an independent company 24 hours a day, seven days a week.  Please note, anonymous reports to the ACE Hotline may be made if so desired but must contain sufficient information.

Adecco will respond promptly to all complaints of harassment, retaliation, and/or discrimination. The investigation will be conducted confidentially to the extent reasonably possible. Where it is determined that inappropriate conduct has occurred, Adecco will act to eliminate the conduct and impose such corrective action as is necessary, including disciplinary action, up to and including immediate termination.

**Government agencies**

In addition to the above, if you believe you have been subjected to harassment (including sexual harassment) or discrimination, you may file a formal complaint with State or Federal equal employment opportunity agencies.

Using Adecco's complaint process does not prohibit you from filing a complaint with the Federal Agency or the State agencies listed below.

The phone number for the US Equal Employment Opportunity Commission (EEOC) is 800.669.4000. This toll-free number will put you in contact with your local EEOC office. Please be advises claims must be filed with the Equal Employment Opportunity Commission within certain, limited timelines.

If you are employed in Illinois, Rhode Island, Massachusetts or California and would like to file a complaint, you may also do so by contacting:

**Illinois***
Illinois Department of Human Rights
100 W. Randolph Street, Suite 5-100, Chicago, IL 60601
312.814.6200
*In Illinois, a Complainant Information Sheet (CIS) must be postmarked or received by the DHR within 180 days.

Adecco Employee Handbook 2016



---

**Rhode Island***
Commission for Human Rights
180 Westminster Street, 3rd Floor
Providence, RI 02903
401.222.2661
*In Rhode Island claims must be filed within 364 days.

**Massachusetts***
Commission Against Discrimination (MCAD)
Boston Office, One Ashburton Place, Room 601, Boston, MA 02108
617.994.6000
*In Massachusetts claims must be filed within 300 days.

**California***
Fair Employment Housing Commission
2014 T Street, Suite 210, Sacramento, CA 95814
800.884.1684
*In California claims must be filed within one year.

Adecco Employee Handbook 2016



better work, better life

# Dress and grooming policy

Appropriate dress and hygiene are important in promoting a positive company image. Therefore, Adecco expects you to be well-groomed and dressed in a professional manner appropriate to your assignment.

Any employee who does not meet the dress and hygiene requirements may be sent home to change.  Employees will not be paid for this time. Employees who do not adhere to these rules may be subject to disciplinary action, up to and including termination.

This policy is not intended to interfere with any employee's disability or religious beliefs or other rights. If for any reason you require an accommodation, contact your Adecco Representative or the HUB.

# Open Door Policy

The Company strongly encourages and supports open communication among employees and Adecco Representatives. Employees should feel free to make suggestions, ask questions, raise issues and air concerns to their Adecco Representative.

An employee who has a concern or complaint should:

1. Speak with his/her Adecco Representative and fully discuss the issue or concern. If not resolved, proceed to 2.
2. Speak with the next level manager If not resolved, proceed to 3.
3. Contact the HUB at 800-793-7657 option 6

Adecco Employee Handbook 2016



# Substance abuse policy[1]

This policy is to ensure that Adecco employs a workforce who is free from the adverse effects of alcoholic beverages, illegal drugs, or legal drugs obtained illegally or taken for the purpose of abuse.

**The following activities are prohibited under Adecco policies and will result in disciplinary action up to and including termination:**

- The use, abuse, purchase, or concealment of illegal drugs while on Adecco or the client's premises, or while performing an assignment

- Any sale or distribution of illegal drugs

- The unauthorized use of alcoholic beverages or the possession of an open container containing alcoholic beverages while on Adecco or the client's premises

- Work impairment due to the use of illegal drugs or legal drugs, or an impermissible level of drugs in the system while performing an assignment

- The abuse of medications prescribed by a physician and/or over-the-counter medication, to the extent that job performance or fitness for duty is adversely affected. The legal use of over-the-counter medication and controlled substances prescribed by a licensed physician is not prohibited; however, employees are required to notify their Adecco Representative or client supervisor when taking any medication that interferes with their ability to perform the essential functions of a particular assignment prior to or during an assignment at a client's facility.

- Involvement with illegal drugs or alcohol which has or may have an adverse impact on the client, for example, where it has or may have an effect on an employee's ability to perform his/her duties, may endanger the safety of fellow employees or the public, may damage the client's or Adecco property, may damage the client's or Adecco's reputation for providing safe and dependable work, or may undermine the public's or government's confidence in Adecco or the client.

Adecco Employee Handbook 2016



# Substance abuse policy[1]

- The physical possession of marijuana, even if authorized or prescribed as a matter of state law, is prohibited while on the premises of the Company, the customer or any location where the employee is required to perform work. The use, possession, and sale of marijuana is illegal as a matter of federal law and therefore is prohibited while on the premises of the Company, the customer or any location where the employee is required to perform work and is a violation of Company policy, even when state law does not consider such use or possession a criminal offense.

**Where permitted by state law, Adecco may require the following types of drug testing:**

- Pre-Assignment
- Return to work
- Post-accident*
- Random
- Reasonable suspicion (for cause)

*Where permissible by law, post-accident drug testing is mandatory and refusal to comply will result in termination.

Should the client request a drug and/or alcohol test for an assignment and the results are positive, the employee should discuss the following options with an Adecco Representative:

- The right to request a copy of the Adecco "Release and Consent for Drug Testing" form you signed
- The right to request a copy of your drug and/or alcohol test results
- The right to request an immediate re-test of your original sample at your expense (or as otherwise required by state law) and at a facility designated by Adecco
    - If the re-test results are positive, your employment with Adecco will be terminated.
    - If the re-test results are negative, you will be eligible for assignment with Adecco.

Adecco Employee Handbook 2016



# Substance abuse policy[1]

Failure to pass a drug test prohibits an employee from assignment with Adecco for a period of 1 year. Eligibility for re-assignment may only be allowed provided the employee has a negative result on a drug test at the end of the 1 year waiting period. The test is to be completed at the employee's expense and at a facility designated by Adecco (or as otherwise required by state law).

1.   If you are in the state of Maine, please ask your Adecco Representative for a copy of Adecco's Substance Abuse Policy for the State of Maine.

# Workplace search policy

To the extent allowed by applicable law, Adecco and its clients reserve the right to conduct searches of employees at any time while on Adecco's or its clients' property or in the performance of work assignments. These searches may include, but are not limited to, an inspection of your person, computer equipment (including hard drive and other removable storage devices), electronic communications (including email, text messages, communications on social networking sites, personal email accounts accessed through Adecco or a client's systems, and voicemail), computer systems (including databases, internet and intranet systems), locker, desk, bag, coat, purse, briefcase, tool box, or other such containers, as well as vehicles parked on Adecco or its clients' property. Such items are intended for business use only, not personal use. Therefore you should have no expectation of privacy with respect to such items. Furthermore, clients may, in accordance with applicable law and in the furtherance of its business interests, monitor, record, use, or disclose, in the client's sole discretion, your electronic communications conducted over the client's phone or computer network. You may also be required to display items for visual inspection upon Adecco or its clients' request. Failure to consent to such search or display for visual inspection may be grounds for termination. In addition, should you improperly remove any items from Adecco or its client or engage in unlawful activity while at the assignment, you may be subject to disciplinary action, up to and including termination.

Adecco Employee Handbook 2016



# Privacy policy

Adecco may share certain personnel/human resource data concerning its employees with non-affiliated third parties, including but not limited to third party administrators, when they are acting on our behalf, or acting jointly with us for the purpose of processing payroll, Workers' Compensation claims, unemployment benefits or any other such matter related to your work assignments. Such data may include name, address, Social Security number, employee ID number, job description, and related information. We may also share such data with our clients in connection with providing services to them. In addition, such data may be shared with other parties as permitted or required by law such as credit bureaus, government entities, in responding to subpoenas and other legal processes, and those with whom you have requested us to share information.

**Media Inquiries**

All media inquiries regarding Adecco and its operations must be referred to the Chief Marketing Officer of Adecco.  Only the Chief Marketing Officer is authorized to make or approve public statements on behalf of Adecco.

**Anti-Bullying Policy**

Adecco defines bullying as "repeated abusive behavior, either direct or indirect, whether verbal, physical or otherwise, conducted by one or more persons against another or others, at the place of work and/or in the course of employment." Such behavior violates Adecco's Code of Conduct.

Adecco will not in any instance tolerate bullying behavior. Employees found in violation of this policy will be disciplined, up to and including termination. Bullying may be intentional or unintentional. The Company considers the following types of behavior examples of bullying:

- Verbal Bullying: slandering, ridiculing or maligning a person or his/her family; persistent name calling which is threatening, humiliating, or intimidating; using a person as butt of jokes that violate Adecco's anti-discrimination and anti-harassment policies; abusive and offensive remarks.

- Physical Bullying: pushing; shoving; kicking; poking; tripping; assault, or threat of physical assault; damage to a person's work area or property.

- Gesture Bullying: non-verbal threatening gestures, glances which can convey threatening messages.

Adecco Employee Handbook 2016



If you experience or witness bullying in the workplace, you should report such to your Adecco Representative or the HUB immediately.

# Code of Business Conduct

At Adecco, we strive every day to earn the trust and loyalty of our associates, customers, suppliers, colleagues, investors, governments and the communities in which we work by bringing our Core Values of Team Spirit, Customer Focus, Passion, Responsibility and Entrepreneurship.

Maintaining our strong reputation requires a clear communication of policy, effective ways to detect potential violations, good leadership and personal responsibility. The Adecco Code of Business Conduct emphasizes both the individual's responsibility to act with integrity and Adecco leaders' responsibility to create a culture of compliance in which employees and others can exercise sound judgment and feel comfortable about raising concerns without fear of retaliation.

Integrity and compliance are core principles at Adecco. How we conduct ourselves day to day – with each other, our clients and our competitors – is the foundation of our reputation as an ethical company. That's why we do everything we can to protect our reputation by making sure our actions and policies are not only legal, but in line with the highest levels of business ethics and personal integrity.

Adecco's Office of Compliance & Business Ethics implements and oversees legal compliance and comprehensive business ethics programs to assure that Adecco's commitment to legal Compliance and Business Ethics is fully understood and embraced by all Adecco colleagues.

We foster an environment of open, honest communication, and we encourage all employees to raise their questions or concerns and to report suspected violations of law or company policy without fear of retaliation. The Adecco Compliance and Ethics Line (ACE Line) is available 24 hours a day, 7 days a week with representatives who can consult with colleagues in almost any language. We encourage you to contact us because no one has better insight into what is happening within Adecco than our people.

**Adecco's Compliance & Ethics Reporting Line (ACE Line)**
**1.800.279.6315**

Adecco Employee Handbook 2016



# Workplace Violence

Adecco's policy is to maintain a work environment free from all forms of violence. Acts or threats of physical violence, possessing a weapon, threatening another individual with bodily harm, or to assault another individual, occurring on Adecco or its client's property or during the performance of Adecco business off Adecco property, are prohibited. Examples of workplace violence include, but are not limited to, conduct such as: threats or acts of physical or aggressive conduct; threats to destroy or intentional destruction of property belonging to Adecco, its clients or their respective employees; physically threatening phone calls or correspondence (including email, text messaging and social media); and/or stalking activities.    Notwithstanding the foregoing, where applicable law expressly prohibits an employer from taking disciplinary action against an individual for storing a weapon in a parking area, Adecco will abide by such law.

The possession, transfer, sale or use of firearms, weapons, explosives or other improper materials with or without valid permit is prohibited on Adecco or its client's premises.[1]

Employees in violation of this policy will be subject to disciplinary action up to and including termination.

Adecco requires employees to report any acts of violence in the workplace and any unlawful weapons observed be reported to the HUB

1.  Exceptions may be extended to security personnel, in Adecco or Client parking lots and parking facilities, or where such is expressly protected by applicable law.

Adecco Employee Handbook 2016



# Employment and income verification

Adecco has contracted with a national employment verification service, The Work Number, a service of TALX Corporation, to provide employment and income information.

Employee data will be provided directly to the lending institution, rental agency, government agency, etc. for the current year plus two-years prior. Data is not available for employees who have been inactive for more than three years.

When you need to provide your Adecco employment history when applying for a mortgage or loan, leasing an apartment, establishing credit, or any other instance where proof of employment is required, provide the requestor with the following information and the requestor will be able to easily and quickly access your employment history, which includes: job title, total time with company, and start date.

**Steps for Company/Lender to follow to obtain basic employment verification:**

- Go to the Work Number web site (www.theworknumber.com) or the toll free phone number (1.800.367.5690) to charge the fee to an account or to a credit card
- Enter Adecco's company code (10265)
- Enter the Employee's social security number
- Follow the prompts to obtain the information

When a company or an individual asks for salary verification, you will first need to request a Salary Key Code from The Work Number which authorizes release of your salary information. Without this Key the verifier will not be able to access your salary information, only employment information.

**Steps for the Employee to follow to obtain a Salary Key:**

To obtain a Salary Key go to www.theworknumber.com or call 1.800.367.2884 and provide the following information:

- Enter Adecco's company code (10265)
- Enter the employee's Social Security number
- Your pin number — Your pin number will be the last 4 digits of your Social Security number

Adecco Employee Handbook 2016



# Employment and income verification

The system will then provide you with a Salary Key. Keep a record of the Key, and provide it to the company that needs to verify your wage information.

If you need to provide salary verification to more than one company, you will need to obtain one Salary Key for each company. Please note that you can have only 3 Salary Keys outstanding. If unused, the Salary Keys will expire automatically after 6 months. A Salary Key Code is not required for companies or individuals who require only verification of employment and not salary information.

**Steps for a Company/Lender to follow to obtain Salary Verifications:**

- Obtain a Salary Key from the employee
- Go to: www.theworknumber.com or call 1.800.367.5690
- Enter the Adecco company code (10265)
- Enter the employee's social security number
- Enter the Salary Key supplied by the employee
- Follow the prompts to obtain the information

**Steps for a Social Service Agency to follow to obtain Salary Verifications:**

- Visit www.theworknumber.com or call 1.800.660.3399
- Enter your registered fax number (If not registered, call 1.800.996.7566 for registration instructions)
- Enter the Adecco company code (10265)
- Enter the employee's social security number when prompted. The verification will be faxed to the pre-registered fax number.

Adecco Employee Handbook 2016



---

# Who to contact

**Contact Payroll Shared Services Center for the following:***
- Garnishments
- Holiday pay
- Paycheck not received (
- replacement checks will not be issued until 5 days after the issue date)
- 
- Payroll amount is incorrect
- Tax withholdings
- Timesheets - entering time and/or the paper timesheet (if applicable)
- W-2

Payroll Shared Services Center
Monday – Friday 7:30am - 8:00pm (EST)
1.866.528.0707
Fax:  866.508.3922
PayrollSSC@adeccona.com

*Contact local Adecco office if you work in the following cities: Ann Arbor, MI;, Normal, IL; Champaign, IL; Corpus Christi, TX; Fort Wayne, IN; Lafayette, IN; LaGrange, GA;  Lawrence, KS; Macon, GA; New Braunfels, TX; San Antonio, TX; Tallahassee, FL; Topeka, KS; Wichita, KS.

**Contact local Adecco Representatives for the following:**

- Completion of each assignment

- At least once per week when not on assignment with Adecco to verify availability for work

- Address, email, or phone number changes

- Experience any type of harassment, or prohibited discrimination, or retaliation (as well as contacting the HUB)

- If you are not being provided an entitled meal or rest break

- Issues and/or questions with entering time and/or the paper timesheet, if applicable (preferred method is to contact the Adecco Payroll Shared Service Center)

- Questions regarding what time should be recorded and/or payroll procedures for your assignment

- If you believe working conditions are unsafe and/or are injured while on

Adecco Employee Handbook 2016



assignment

# Who to contact

- Injured on the job and physician indicates that you cannot return to your regular job, after each medical appointment to report progress
- If you are asked to perform work which was not part of your initial job description
- Late for your assignment or have any emergency or illness that prevents you from going to work (if late or absent and it relates to FMLA, you will also need to contact your Leave Administrator)
- Requests for full-time employment with the client
- Requests for an increase in pay
- Change of hours or days worked
- If the client advises you not to report overtime hours worked
- Preapproval for overtime hours
- If you are convicted of a crime other than a minor traffic violation
- If you are requested for jury or witness duty
- If you have been requested to travel, operate vehicles or machinery, work in an unsupervised premise or handle cash, keys, negotiable, credit cards, check-writing/printing materials, merchandise or confidential information if such tasks were not originally part of your assignment
- To arrange for any personal items left at a client site to be given back to you
- To return any IDs or badges belonging to the client
- Results of a drug test are positive

**You may also contact your Adecco representative with questions about:**

- Tuition reimbursement
- Experience and/or observe any acts of violence and/or weapons in the workplace
- FMLA
- American with Disabilities Act
- Pregnancy Disability Leave (California residents should contact Sedgwick at 1.800.735.7836)
- AARP (contact AARP representative once one-year membership expires)

39

Adecco Employee Handbook 2016



# Who to contact

**The HUB**
800-793-7657 option 6
thehub@adeccona.com
- Complaints and/or disputes about assignment and/or working conditions
- Experienced or witnessed harassment, discrimination, or retaliation
- If other Adecco representatives are not adequately addressing your concern or complaint

**Bank Of America/MoneyNetwork**
1-800-845-8683


**Current job duties**

- Contact your client representative for on-the-job questions about tasks being performed

**Direct deposits**

- Your bank institution to verify funds were deposited Adecco will not be responsible for overdrafts on your account

**Pay stub**
1-800-978-3729

- View and/or print a copy of pay advice on-line at http://paperlesspay.talx.com/Adecco


Text Pay Information
1-904-323-3430


**Employee benefits**
1-877-632-9169

- Questions or concerns regarding current employee benefits

**401(k) Plan**
1-877-632-9169

Adecco Employee Handbook 2016



- To request enrollment information, please send an email to
  401K@adeccona.com

# Who to contact

**FMLA**
1.866.689.5707(The Hartford)
California only: 1.800.735.7836 (Sedgwick)

**Disability**
California only: 1.800.735.7836 (Sedgwick)
New York only: 1.866.689.5707 (The Hartford)

- All other employees contact State agency for the state sponsored programs

**Prescription plan**
ScriptSave©
www.scriptsave.com
Group 241

**Unemployment**
- Your State's unemployment agency

**Wage/salary verification**
1.800.367.2884
www.theworknumber.com
Company code: 10265

**Employment Opportunity Commission (EEOC) and Other Contacts**
EEOC:            1.800.669.4000
Illinois:                    312.814.6269
Rhode Island:            401.222.2664
Massachusetts:          617.727.3990
California:                  1.800.884.1684

**EXHIBIT 6**



----- Forwarded Message -----
**From:** Lewis, Jordan <Jordan.Lewis@adeccona.com>
**To:** Lewis, Jordan <Jordan.Lewis@adeccona.com>
**Cc:** Awadallah, Nadia <Nadia.Awadallah@adeccona.com>; quemanagers@rrtusa.com
<quemanagers@rrtusa.com>; servers@rrtusa.com <servers@rrtusa.com>; 'ktep@rrtusa.com'
<ktep@rrtusa.com>; Stacey Raus (sraus@rrtusa.com) <sraus@rrtusa.com>
**Sent:** Wednesday, November 23, 2016, 11:38:39 AM EST
**Subject:** Adecco/RRT Attendance Policy


Hello All,


There have been several questions surrounding the recently sent attendance policy, and I would like to
take a moment to clear things up.


Adecco and RRT came together and put in place the attached attendance policy to ensure that everyone
is aware of expectations. This went into effect on 11/3/2016 and is being tracked very closely. It is
extremely important that each of you show up on time and ready to work for each of your scheduled
shifts. With that being said, we do understand that situations arise and some things are out of your
control. If you are unable to make a shift, you need to notify Adecco and send in a shift swap approval
request form (attached) to quemanagers@rrtusa.com as soon as possible. This is to ensure that there is
coverage for your shift. Anytime it is noticed that any one person has excessive, unexcused absences or
tardies, that person will be contacted by Adecco.


I am sure you are all aware that call volume is high and not slowing down anytime soon. We are all in this
together and want to make sure that each RRT caller is taken care of. If you have any questions
regarding the attendance policy, or any other policies, please feel free to reach out to Adecco.


Thank you and have a Happy Thanksgiving!


**Jordan Lewis**

*Account Executive*

**Adecco Office & Industrial**



Tel 760.931.8190

Cell 702.218.8822
Fax 760.931.8193

6183 Paseo Del Norte, Suite 160

Carlsbad, CA 92011

Jordan.Lewis@adeccona.com

www.adeccousa.com

https://www.linkedin.com/in/jordanlewisadeccona

# EXHIBIT 7



# Adecco Attendance and Punctuality Policy
### For associates assigned to RRT

## Overview

Attendance and punctuality are essential for a productive and successful assignment.  As an Adecco Associate, you are expected to be at work, on time, and as scheduled for your assignment at RRT.  Unexcused absences will not be tolerated. If you are going to be late or absent, it is your responsibility to notify Adecco <u>at least</u> 30 minutes before the start of your shift.

## Scheduling Requests

Scheduled time off requires advanced approval by Adecco and RRT. You must request approval for time off at least 2 weeks before the scheduled time. Time off requests will be processed on a first come, first served basis according to business needs. Any shift that you cannot comply with should be reported to Adecco within 48 hours of the schedule release.

## Reporting Absences

Attendance and punctuality is crucial for success while on assignment at RRT.  If you are going to be absent or late, you must call Adecco and RRT <u>at least 30 minutes</u> prior to your shift start time.  Calling in after your scheduled start time may result in an unexcused absence.  When calling in to report an absence you must include:

- Your First and Last Name
- Supervisor's name and department
- Shift scheduled to work
- Reason for tardy or absence
- Time or date you will report to work
- YOU must call in your absence or tardy.  Barring extreme circumstances, absence and tardy call-ins will only be accepted from the employee.  Calls from friends, family, and coworkers may be considered unexcused based on Adecco's discretion

## Adecco Contact Information

Nadia Awadallah
Nadia.Awadallah@adeccona.com
760-931-8190

Jordan Lewis
Jordan.Lewis@adeccona.com
702-218-8822

## RRT Contact Information
Please email the Shift Swap Approval Request Form to quemanagers@rrtusa.com (see form attached)

## Attendance and Punctuality Policy

- Unexcused absences of one or more consecutive days will count as one (1) occurrence for each day incurred.
- If you are more than 30 minutes late for a scheduled shift, this will be considered (1) occurrence
- An unapproved tardy or leaving work early will also count as ½ an occurrence.
- You are **<u>allowed five (5) occurrences</u>** within a rolling 12 month period of time.  Occurrences beyond this will result in corrective action, up to including termination from the assignment.
- Failure to call in to report tardy or absence may result to corrective action, up to including termination, at Adecco's discretion.



I understand the Adecco attendance policy for my assignment RRT.  I also understand that should I exceed five (5) unexcused occurrences, Adecco may end my assignment.


_____          _____          _____
Adecco Associate - Print Name                      Signature                                             Date


_____          _____          _____
Adecco Colleague - Print Name                      Signature                                             Date

# EXHIBIT 8



---------- Forwarded message ----------
From: **Kelly Tep** <ktep@rrtusa.com>
Date: Mon, Feb 19, 2018 at 1:04 PM
Subject: Reporting Absences Important
To: RRT Servers <servers@rrtusa.com>, Stacy Raus <sraus@rrtusa.com>, Brandon Smith
<bsmith@rrtusa.com>, "Lewis, Jordan" <jordan.lewis@adeccona.com>, "Crain, Brett"
<Brett.Crain@adeccona.com>, "Corona, Luz" <Luz.Corona@adeccona.com>


Hi Team,
Many absences can be avoided by finding coverage for your shift, If you are not in coverage chat please
reach out to me to be added.

Attendance and punctuality is crucial for success while on assignment at RRT.  If you are going to be
absent or late, you must call Adecco and RRT at least 30 minutes prior to your shift start time.  Calling in
after your scheduled start time may result in an unexcused absence.  When calling in to report an
absence you must include:
- Your First and Last Name
- Supervisor's name and department
- Shift scheduled to work
- Reason for tardy or absence
- Time or date you will report to work
-   YOU must call in your absence or tardy.  Barring extreme circumstances, absence and tardy
  call-ins will only be accepted from the employee.  Calls from friends, family, and coworkers may be
  considered unexcused based on Adecco's discretion.

*Informing only Adecco or only RRT will be considered failure to report the absence. This applies to all servers and SME.

**Adecco Contact Information**

Adecco  760-931-8190

**RRT Contact Information**

Email quemanagers@rrtusa.com
(if you don't have internet access call the helpline @ 855-657-3603)

**Attendance and Punctuality Policy**

- Unexcused absences of one or more consecutive days will count as one (1) occurrence for each day incurred.
- If you are more than 30 minutes late for a scheduled shift, this will be considered (1) occurrence
- An unapproved tardy or leaving work early will also count as ½ an occurrence.
- You are **allowed five (5) occurrences** within a rolling 12 month period of time.  Occurrences beyond this will result in corrective action, up to including termination from the assignment.
- Failure to call in to report tardy or absence may result to corrective action, up to including termination, at Adecco's discretion.



**Kelly Tep**
HIRING & DEVELOPMENT LIAISON
RESTAURANT REVOLUTION TECHNOLOGIES, INC.

M (209) 276-1032   E ktep@rrtusa.com
W www.rrtusa.com S HappyKellyRRT

*The Off-Premise Partner for Restaurant*

--



**Virginia Farley**
*VIRTUAL SERVER*

M  321.696.1620
E  **Vfarley@rrtusa.com**

RESTAURANT REVOLUTION TECHNOLOGIES, INC
*The Off-Premise Partner for Restaurants*

# EXHIBIT 9

# *Virtual Server* Guidelines

**Effective Date: 11/3/2017**

## INTRODUCTION

These Guidelines are for all Adecco employees assigned to RRT as Virtual Servers who are home-based and are paid on an hourly basis. Servers who work at home are subject to these guidelines. Where differences occur in policies or procedures indicated, these guidelines will take precedence.

## MEETING THE *RRT* HIRING STANDARDS

We hire only the best! To be eligible to work at home under *RRT* virtual server policy, applicants must be identified as follows:

·      Must pass Server screening tools, interviews, and background check criteria. This information may vary depending on the client to be supported and all client-required hiring documentation will be communicated during the interview process.
·      Must have ability to troubleshoot minor computer issues.
·      Must have adequate equipment and connectivity to work from home.
·      Must be self directed and self motivated.
·      Must be fully trained in the required line of business.
·      Must be able to provide a quiet, uninterrupted work environment in their home.

It is critical that our Virtual Servers provide prompt notification to *RRT* of any address change or intention to move.

## SCHEDULING

The flexibility of working at home does not change the fact that we have commitments to our clients to provide a certain amount of call coverage or production completion within a set time frame. As a result, all servers need to be scheduled to ensure that coverage. *RRT Virtual* Servers will be held accountable for working their schedule so that *RRT* can ensure that we are adequately staffed to meet inbound/outbound call volumes and/or non-phone work expectations for our clients.

Hours of work for the Server will be scheduled by RRT will be based on needs of the business.

Servers are expected to devote their entire attention to their duties during work hours except when taking scheduled breaks and meal periods.

Requests for schedule changes or other leave situations must be requested according to the *RRT* policies and procedures and will be granted or denied in accordance with such policies and procedures. Servers who are clocked/system logged in must be at their workstation in Working Mode; Supervisors will contact employees who are not in schedule adherence.

## GETTING PAID

*RRT* Virtual Servers will be paid by the hour. Pay will be weekly. Pay is processed by Adecco.

## ONBOARDING AND TRAINING

The new hire paperwork must be completed and returned to Adecco as soon as possible.

New Hire client and product based training will take place on-line, by video conference call.

- Attendance for such additional training is mandatory.
- Servers must complete training with an acceptable competency in accordance with established *RRT* standards.

## SUPERVISION AND COMMUNICATION

Communication is the key to any good relationship. RRT Virtual Supervisors will be highly engaged and will work to ensure that our RRT Virtual Servers receive direction, motivation, and recognition. *RRT virtual* Servers will report to a supervisor identified and we expect consistent and frequent communication with this supervisor, as well as other supervisors. The communication methods and expectations listed below are not all inclusive:

·      Participation in scheduled coaching sessions via phone, virtual meeting rooms or other online meeting sources, is mandatory.
·      Servers must be available to make phone calls to and receive phone calls from their supervisor while in a Working Mode.
·      Servers will be required to utilize chat tools, email and voicemail for the purposes of communicating with their supervisor.
·      Servers must have their chat tool opened at all times during their shift for Real Time communication with their supervisor and other support resources.
·      Additional operational guidelines and procedures may be required.  Adherence to any additional operational guidelines provided by *RRT* will be mandatory.

## PERFORMANCE

At *RRT,* we take pride in being the top quality provider to our clients and their customers. We will hire the best talent and will expect and reward the best performance to ensure that we can deliver what we promise to our customers. RRT Virtual servers will be responsible for meeting performance metrics which are specific to the client and line of business.

Performance expectations will be outlined during training and every effort will be made to ensure that our contractors have the tools, guidance, feedback and motivation to meet these metrics.

·      If any incident occurs that prevents an Server from taking calls or performing work functions, immediate notification to Adecco and RRT supervisor is required via email & personal telephone call.

RRT will monitor and record electronic communications over the telephone and computer during Servers work shift for business purposes.

**ATTENDANCE-**

Our business success is dependent on being able to deliver what our clients and their customers need when our clients and customers want those services. We will work to create flexibility in scheduling where possible, but once scheduled, it is critical that our Servers work when we expect them to be working.

Servers are expected to maintain good attendance.  Violations of the applicable attendance policy will result in progressive corrective action up to and including termination.

For other injury or illness, Servers should contact Adecco and their RRT supervisor immediately.

Servers are responsible for checking in with their supervisor by chat, email or telephone at the start and end of each workday and when signing in and out for scheduled breaks. Servers are otherwise expected to be accessible by chat, email and/or phone during scheduled working hours.

Employees are allowed no more than 4 shift swaps per month. If more than four of these occur in a 30 day period or any time there are more than 4 total in a 30 day period a Company Coaching Session must occur.

If you do not work any hours for 3o consecutive days your assignment may end without notice

**SCHEDULING TIME OFF**

At *RRT*, we recognize that Servers work to live and not the other way around. However, to ensure that we are providing services to our clients and their customers we need our Servers to plan ahead if they are aware of a future day that they need to schedule off. Pre-approved, scheduled time off does not negatively impact attendance and helps our Servers maintain a work/home life balance.

Servers must obtain advanced approval at least 2 weeks before the scheduled time off. Requests will be granted on a first come first served basis according to the business rules.

For new hires, you are not allowed any vacation in the next 90 days, unless it is an emergency. Approval is required.

No shift swaps will be granted in the first 90 days of employment, unless it is an emergency. Approval is required.

A maximum 15 days of unpaid vacation in a given year is allowed.

**ON CALL SERVERS**

On call servers are expected to work a minimum of 10 hours per week.

==Failure to work a minimum of 10 hours for (4) consecutive weeks will be considered job abandonment and your assignment may end without notice==

## SECURITY AND PROFESSIONALISM

*RRT Virtual Servers* are responsible for adhering to all IT Systems and Security Usage policies, as well as the *RRT* Code of Business Conduct, including but not limited the following important points:

·   Login Security: The security of system logins and passwords must be maintained in a secure place so that no unauthorized user can access these systems. network in order to perform work.
·   Proprietary information:
o  Adherence to privacy and confidentiality policies is mandatory.
o  Work will not be performed in front of other non-*RRT* personnel to minimize the risk of distraction as well as the risk of disclosure of confidential information.
o  Webroot anti virus must be installed and active at all times when working for RRT

## ·   EQUIPMENT AND CONNECTIVITY

*RRT Virtual* Servers will be responsible for providing and properly maintaining their own equipment at home.  Neither *RRT* nor our clients will provide any personal computer equipment or internet service connectivity for Virtual Servers.  *RRT Virtual* servers will not be reimbursed for any cost associated with purchasing, maintaining, servicing or upgrading the personal equipment to enable them to perform the services required by *RRT*.

## HEADSET PURCHASE REQUIREMENTS
RRT Virtual Servers who are hired to handle voice customer contacts during their work shift will be required to purchase a specific headset to enable them to do their jobs.

## TELEPHONE SERVICE & INTERNET SPECIFICATIONS
RRT Virtual Servers will be given a link to RRT internal phone software.
RRT Virtual servers will be required to be plugged into their modem during working hours via ethernet cable.
RRT Virtual servers will be required to have a dedicated internet connection used exclusively for work.
- No additional connections via wifi or ethernet cable
- No use of non work programmes
- ==Only one agent per IP address or household==

## ERGONOMICS, FURNITURE, WORK ENVIRONMENT. AND SAFETY

*RRT* will not be responsible for costs associated with the initial setup of the Virtual Server's work environment such as remodeling, furniture or lighting, nor for repairs or modifications to the home work

environment.   Servers  will  be  offered  appropriate  guidance  in  setting  up  a  home  work  environment designed  for  safe  and  comfortable  work.  Servers  will  be  responsible  for  providing  their  own  home  work environment set-up, including:

·   Servers  must provide their own adequate desk or table with adequate room for peripheral equipment (i.e. mouse) and appropriate computer placement.
·    Servers must provide adequate chairs and must work while seated in chairs that provide proper ergonomic alignment.
·     The work environment must be free from all distractions that will interfere with productivity or quality work. In most instances this means the work environment must be removed from the living areas if other people live in the home and should be limited to a private area such as a dedicated office when others are present.
·     Dependent care arrangements must be made so as not to interfere with work responsibilities.
·     Personal distractions, such as non-business telephone calls, pets and visitors must not interfere with work performance.
·     Virtual servers  who handle telephone calls must ensure that all noises (pets, children, door bells, etc.) are eliminated and cannot be heard by the customers being serviced by at Home contractors. External noises that are overheard on a customer call can result in corrective action up to and including termination  of contractor relationship.

*Virtual Servers* will be responsible for establishing and maintaining a safe work environment

## EXCEPTIONS AND CHANGEABILITY
 The management of *RRT* reserves the right to modify the content of this policy or discontinue its use at anytime with or without notice.

## ENFORCEMENT OF THE POLICY

Failure  to  adhere  to  the  procedures  in  this  policy  may  result  in  corrective  action  up  to  and  including termination of employment.

Sign   _____

Date  _____

# EXHIBIT 10

Administrator's Interpretation No. 2016-1: Joint Employment Under the FLSA and MSPA - U.S. Department of Labor Ã¢‚¬â€ Wage and Hour Division (WHD)

Case 2:18-cv-01185   Document 1   Filed 08/13/18   Page 109 of 135

**Wage and Hour Division**

SHARE

★ Was this page helpful?

DOL Home > WHD > FLSA > Joint Employment AI > Administrator's Interpretation No. 2016-1

U.S. Department of Labor
Wage and Hour Division
Washington, D.C. 20210

## Administrator's Interpretation No. 2016-1 (PDF)

January 20, 2016

Issued by ADMINISTRATOR DAVID WEIL

---

### SUBJECT: Joint employment under the Fair Labor Standards Act and Migrant and Seasonal Agricultural Worker Protection Act.

---

Through its enforcement efforts, the Department of Labor's Wage and Hour Division (WHD) regularly encounters situations where more than one business is involved in the work being performed and where workers may have two or more employers. More and more, businesses are varying organizational and staffing models by, for instance, sharing employees or using third-party management companies, independent contractors, staffing agencies, or labor providers. As a result, the traditional employment relationship of one employer employing one employee is less prevalent.[1] WHD encounters these employment scenarios in all industries, including the construction, agricultural, janitorial, warehouse and logistics, staffing, and hospitality industries.

The growing variety and number of business models and labor arrangements have made joint employment more common.[2] In view of these evolving employment scenarios, the Administrator believes that additional guidance will be helpful concerning joint employment under the Fair Labor Standards Act (FLSA), 29 U.S.C. 201, et seq., and the Migrant and Seasonal Agricultural Worker Protection Act (MSPA), 29 U.S.C. 1801, et seq.[3]

Whether an employee has more than one employer is important in determining employees' rights and employers' obligations under the FLSA and MSPA. It is a longstanding principle under both statutes that an employee can have two or more employers for the work that he or she is performing. When two or more employers jointly employ an employee, the employee's hours worked for all of the joint employers during the workweek are aggregated and considered as one employment, including for purposes of calculating whether overtime pay is due. Additionally, when joint employment exists, all of the joint employers are jointly and severally liable for compliance with the FLSA and MSPA.[4] Where joint employment exists, one employer may also be larger and more established, with a greater ability to implement policy or systemic changes to ensure compliance. Thus, WHD may consider joint employment to achieve statutory coverage, financial recovery, and future compliance, and to hold all responsible parties accountable for their legal obligations.

Certainly, not every subcontractor, farm labor contractor, or other labor provider relationship will result in joint employment. This Administrator's Interpretation (AI) provides guidance on identifying those scenarios in which two or more employers jointly employ an employee and are thus jointly liable for compliance under the FLSA or MSPA.[5] This AI first discusses the broad scope of the employment relationship under the FLSA and MSPA. It then discusses the concepts of horizontal and vertical joint employment and relevant joint employment regulations.

Horizontal joint employment exists where the employee has employment relationships with two or more employers and the employers are sufficiently associated or related with respect to the employee such that they jointly employ the employee. The analysis focuses on the relationship of the employers to each other. This AI explains that guidance provided in the FLSA joint employment regulation – which focuses on the relationship between potential joint employers – is useful when analyzing potential horizontal joint employment cases.

Vertical joint employment exists where the employee has an employment relationship with one employer (typically a staffing agency, subcontractor, labor provider, or other intermediary employer) and the economic realities show that he or she is economically dependent on, and thus employed by, another entity involved in the work. This other employer, who typically contracts with the intermediary employer to receive the benefit of the employee's labor, would be the potential joint employer. Where there is potential vertical joint employment, the analysis focuses on the economic realities of the working relationship between the employee and the potential joint employer. This AI explains that guidance provided in the MSPA joint employment regulation is useful when analyzing potential vertical joint employment. The structure and nature of the relationship(s) at issue in the case, reflecting potentially horizontal or vertical joint employment or both, should determine how each case is analyzed.

### I. The FLSA and MSPA Broadly Define the Employment Relationship and Thus the Scope of Joint Employment

The scope of employment relationships subject to the protections of the FLSA and MSPA is broad. The FLSA defines "employee" as "any individual employed by an employer," 29 U.S.C. 203(e)(1), and "employer" as including "any person acting directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. 203(d). The FLSA's definition of "employ" "includes to suffer or permit to work." 29 U.S.C. 203(g). The "suffer or permit" definition of employment is "'the broadest definition that has ever been included in any one act.'" U.S. v. Rosenwasser, 323 U.S. 360, 363 n.3 (1945) (quoting statement of Sen. Hugo Black, 81 Cong. Rec. 7657 (1938)). MSPA defines "employ" in exactly the same way as the FLSA, and the scope of employment relationships under MSPA is thus the same as it is under the FLSA. See 29 U.S.C. 1802(5) ("The term 'employ' has the meaning given such term under [the FLSA, 29 U.S.C. 203(g)]."); 29 C.F.R. 500.20(h)(1); see also 29 C.F.R. 500.20(h)(2)-(3) (the terms "employer" and "employee" under MSPA are also given their meaning as found in the FLSA).

The FLSA and MSPA both "specifically cover 'joint employment' relationships." Antenor v. D & S Farms, 88 F.3d 925, 929 (11th Cir. 1996). The FLSA regulations explicitly state that a single worker may be "an employee to two or more employers at the same time." 29 C.F.R. 791.2(a); see also Baystate Alt. Staffing, Inc. v. Herman, 163 F.3d 668, 675 (1st Cir. 1998) ("The FLSA contemplates several simultaneous employers, each responsible

Administrator's Interpretation No. 2016-1: Joint Employment Under the FLSA and MSPA - U.S. Department of Labor â¢â€ Wage and Hour Division (WHD)

Case 2:18-cv-01185   Document 1   Filed 08/13/18   Page 110 of 135

for compliance with the Act."). The MSPA regulations provide that MSPA's definition of the term "employ" includes the FLSA's joint employment principles. *See* 29 C.F.R. 500.20(h)(5); *see also Antenor*, 88 F.3d at 929 (MSPA makes clear that a worker can be jointly employed by more than one entity at the same time). "Joint employment under the Fair Labor Standards Act is joint employment under the MSPA." 29 C.F.R. 500.20(h)(5)(i) (emphasis omitted).[6]

The concept of joint employment, like employment generally, "should be defined expansively" under the FLSA and MSPA. *Torres-Lopez v. May*, 111 F.3d 633, 639 (9th Cir. 1997); *see also* Misclassification AI, 3-4. The concepts of employment and joint employment under the FLSA and MSPA are notably broader than the common law concepts of employment and joint employment, which look to the amount of control that an employer exercises over an employee. *See Antenor*, 88 F.3d at 933. Unlike the common law control test, which analyzes whether a worker is an employee based on the employer's control over the worker and not the broader economic realities of the working relationship, the "suffer or permit" standard broadens the scope of employment relationships covered by the FLSA. *See Walling v. Portland Terminal Co.*, 330 U.S. 148, 150-51 (1947) (FLSA's definitions are "comprehensive enough to require its application" to many working relationships which, under the common law control standard, may not be employer-employee relationships); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (FLSA's "suffer or permit" standard for employment "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles."). The test for joint employment under the FLSA and MSPA is thus different, for example, than the test under other labor statutes, such as the National Labor Relations Act, 29 U.S.C. 151 *et seq.*, and the Occupational Safety and Health Act, 29 U.S.C. 651 *et seq.* Indeed, in FLSA and MSPA cases, "courts have found economic dependence under a multitude of circumstances where the alleged employer exercised little or no control or supervision over the putative employees." *Antenor*, 88 F.3d at 933 n.10.

Moreover, prior to the FLSA's enactment, "suffer or permit" or similar phrasing was commonly used in state laws regulating child labor and was "designed to reach businesses that used middlemen to illegally hire and supervise children." *Antenor*, 88 F.3d at 929 n.5. A key rationale underlying the "suffer or permit" standard was that an employer should be liable for the child labor if it had the opportunity to detect work being performed illegally and the ability to prevent it from occurring. *See, e.g., People ex rel. Price v. Sheffield Farms-Slawson-Decker Co.*, 225 N.Y. 25, 29-31 (N.Y. 1918). Thus, the "suffer or permit to work" standard was designed to expand child labor laws' coverage beyond those who controlled the child laborer, counter an employer's argument that it was unaware that children were working, and prevent employers from using "middlemen" to evade the laws' requirements.

In sum, the expansive definition of "employ" as including "to suffer or permit to work" rejected the common law control standard and ensures that the scope of employment relationships and joint employment under the FLSA and MSPA is as broad as possible.

## II. Horizontal and Vertical Joint Employment Analyses in FLSA and MSPA Cases

The FLSA and MSPA regulations provide relevant and complementary guidance on joint employment. The structure and nature of the relationship(s) at issue should determine whether a particular case should be analyzed under horizontal or vertical joint employment, or both.[7]

Joint employment may exist when two (or more) employers each separately employ an employee and are sufficiently associated with or related to each other with respect to the employee. See 29 C.F.R. 791.2. This type of joint employment is sometimes referred to as **horizontal** joint employment. In a possible horizontal joint employment situation, there is typically an established or admitted employment relationship between the employee and each of the employers, and often the employee performs separate work or works separate hours for each employer. Thus, the focus of a horizontal joint employment analysis is the relationship between the two (or more) employers. The FLSA regulation provides guidance on horizontal joint employment. *See, e.g., Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 917-18 (9th Cir. 2003) (citing FLSA regulation). Examples of horizontal joint employment may include separate restaurants that share economic ties and have the same managers controlling both restaurants, *see Chao v. Barbeque Ventures, LLC*, 2007 WL 5971772, at *6 (D. Neb. Dec. 12, 2007), or home health care providers that share staff and have common management, *see A-One Med. Servs.*, 346 F.3d at 918.

Joint employment may additionally exist when an employee of one employer (referred to in this AI as an "intermediary employer") is also, with regard to the work performed for the intermediary employer, economically dependent on another employer (referred to in this AI as a "potential joint employer").[8] *See* 29 C.F.R. 500.20(h)(5); *A-One Med. Servs.*, 346 F.3d at 917 (describing vertical joint employment as possible in circumstances where "a company has contracted for workers who are directly employed by an intermediary company"). This type of joint employment is sometimes referred to as **vertical** joint employment. The vertical joint employment analysis is used to determine, for example, whether a construction worker who works for a subcontractor is also employed by the general contractor, or whether a farmworker who works for a farm labor contractor is also employed by the grower.[9] Unlike in horizontal joint employment cases, where the association between the potential joint employers is relevant, the vertical joint employment analysis instead examines the economic realities of the relationships between the construction worker and the general contractor, and between the farmworker and the grower, to determine whether the employees are economically dependent on those potential joint employers and are thus their employees. The MSPA regulation provides a set of factors to apply an economic realities analysis in vertical joint employment cases. Although they do not all apply the same factors, several Circuit Courts of Appeals have also adopted an economic realities analysis for evaluating vertical joint employment under the FLSA. Regardless of the exact factors, the FLSA and MSPA require application of the broader economic realities analysis, not a common law control analysis, in determining vertical joint employment.

The joint employment approaches described in the FLSA and MSPA regulations interpret the same definition of employment. MSPA borrowed the FLSA's definition of the term "employ" "with the deliberate intent" of adopting the FLSA's joint employer doctrine "as the 'central foundation' of MSPA and 'the best means by which to insure that the purposes of this MSPA would be fulfilled.'" 29 C.F.R. 500.20(h)(5)(ii) (quoting MSPA's legislative history); see also 29 C.F.R. 500.20(h)(5)(i) ("Joint employment under the Fair Labor Standards Act is joint employment under the MSPA.") (emphasis omitted). Therefore, the FLSA regulation is useful when analyzing potential horizontal joint employment cases, whether arising under the FLSA or MSPA. Likewise, the factors identified in the MSPA regulation are useful when analyzing potential vertical joint employment cases, whether arising under MSPA or the FLSA.[10] This is not to say that the MSPA joint employment regulation itself applies in FLSA cases; however, the MSPA joint employment regulation and its economic realities factors are useful guidance in an FLSA case because of the shared definition of employment and the coextensive scope of joint employment between the FLSA and MSPA.[11] For the reasons explained above, including the common definitions, using the joint employment factors identified in the MSPA regulation in an FLSA case is consistent with both statutes and regulations. It is also consistent with WHD's prior guidance. *See* Home Care AI, 3 (economic realities factors identified in the MSPA regulation should be considered when determining joint employment under the FLSA, citing 29 C.F.R. 500.20(h)); May 11, 2001 WHD Opinion Letter (identifying MSPA regulation's economic realities factors as relevant factors when determining joint employment under the FLSA, citing 29 C.F.R. 500.20(h)) (available at 2001 WL 1558966). Many potential joint employment cases arising under the FLSA will involve vertical joint employment, and an economic realities analysis of the type described in the MSPA joint employment regulation should be applied in those cases.

### A. Horizontal Joint Employment and the Association of Potential Joint Employers

Administrator's Interpretation No. 2016-1: Joint Employment Under the FLSA and MSPA - U.S. Department of Labor Ã¢‚¬â€ Wage and Hour Division (WHD)

Case 2:18-cv-01185   Document 1   Filed 08/13/18   Page 111 of 135

Horizontal joint employment should be considered when an employee is employed by two (or more) technically separate but related or overlapping employers.[12] For example, the horizontal joint employment analysis would apply where a waitress works for two separate restaurants that are operated by the same entity and the question is whether the two restaurants are sufficiently associated with respect to the waitress such that they jointly employ the waitress; or where a farmworker picks produce at two separate orchards and the orchards have an arrangement to share farmworkers. In these scenarios, there would already be an established employment relationship between the waitress and each restaurant, and between the farmworker and each orchard. This joint employment analysis focuses on the relationship of the employers to each other.

In cases where joint employment is established, the employee's work for the joint employers during the workweek "is considered as one employment," and the joint employers are jointly and severally liable for compliance, including paying overtime compensation for all hours worked over 40 during the workweek. 29 C.F.R. 791.2(a).

**Example:**[13] Casey, a registered nurse, works at Springfield Nursing Home for 25 hours in one week and at Riverside Nursing Home for 25 hours during that same week. If Springfield and Riverside are joint employers, Casey's hours for the week are added together, and the employers are jointly and severally liable for paying Casey for 40 hours at her regular rate and for 10 hours at the overtime rate. Casey should receive 10 hours of overtime compensation in total (not 10 hours from each employer).

In determining whether a horizontal joint employment relationship exists, the focus should be on the relationship (and often the degree of association) between the two (or more) potential joint employers with respect to the employee and all of the relevant facts of the particular case. *See* 29 C.F.R. 791.2(b). According to 29 C.F.R. 791.2(b), "[w]here the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist" in situations such as: (1) arrangements between the employers to share or interchange the employee's services; (2) where one employer acts directly or indirectly in the interest of another employer in relation to the employee; or (3) where the employers are associated "with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer." *Id.* at 791.2(b). In *Schultz v. Capital International Security, Inc.*, for example, the court looked to the FLSA regulation and concluded that security workers were jointly employed by a security firm and the individual that the workers were hired to protect because the two employers were associated with respect to the employment of the workers and shared common control over them. *See* 466 F.3d 298, 306 (4th Cir. 2006) ("the entire employment arrangement fits squarely within the third example of joint employment in the regulation"). Specifically, the court explained that the employers were both involved in the hiring of the workers, played some role in scheduling, discipline, and terminations, and shared responsibility for supplying the workers with equipment. *See id.*

The following facts may be relevant when analyzing the degree of association between, and sharing of control by, potential horizontal joint employers:

- who owns the potential joint employers (i.e., does one employer own part or all of the other or do they have any common owners);
- do the potential joint employers have any overlapping officers, directors, executives, or managers;
- do the potential joint employers share control over operations (e.g., hiring, firing, payroll, advertising, overhead costs);
- are the potential joint employers' operations inter-mingled (for example, is there one administrative operation for both employers, or does the same person schedule and pay the employees regardless of which employer they work for);
- does one potential joint employer supervise the work of the other;
- do the potential joint employers share supervisory authority for the employee;
- do the potential joint employers treat the employees as a pool of employees available to both of them;
- do the potential joint employers share clients or customers; and
- are there any agreements between the potential joint employers.

*See,* e.g., 29 C.F.R. 791.2(b); June 14, 2005 WHD Opinion Letter (identifying a number of the above facts as relevant in finding joint employment) (available at 2005 WL 6219105); April 11, 2005 WHD Opinion Letter (identifying a number of the above facts in finding joint employment) (available at 2005 WL 2086804); *Barbeque Ventures*, 2007 WL 5971772, at *1, 5-6 (separate legal entities who employed employees at five different restaurants were joint employers given common ownership, management and control; the same manager owned one legal entity, was the majority owner and manager of the other entity, and supervised the Area Director for all five restaurants). This is not an all-inclusive list of facts that could potentially be relevant to the analysis. Moreover, not all or most of the foregoing facts need to be present for joint employment to exist. Rather, these facts can help determine if there is sufficient indication that the potential joint employers are associated with respect to the employee and thus share control of the employee.

Joint employment does not exist, however, if the employers "are acting entirely independently of each other and are completely disassociated" with respect to an employee who works for both of them. 29 C.F.R. 791.2(a). In that event, each employer may disregard all work performed by the employee for the other when determining its own responsibilities under the law. *See id.* There are many workers who have multiple jobs with multiple employers who are not joint employers. For example, a high school teacher may also work a part-time job as an instructor for a standardized test preparatory company; the high school and the preparatory company would not be joint employers. In sum, the focus of the horizontal joint employment analysis is the degree of association between the two potential joint employers even if they are formally separate legal entities and the degree to which they share control of the employee.

**Example:** An employee is employed at two locations of the same restaurant brand. The two locations are operated by separate legal entities (Employers A and B). The same individual is the majority owner of both Employer A and Employer B. The managers at each restaurant share the employee between the locations and jointly coordinate the scheduling of the employee's hours. The two employers use the same payroll processor to pay the employee, and they share supervisory authority over the employee. These facts are indicative of joint employment between *Employers A and B*.

In contrast, an employee works at one restaurant (Employer A) in the mornings and at a different restaurant (Employer B) in the afternoons. The owners and managers of each restaurant know that the employee works at both establishments. The establishments do not have an arrangement to share employees or operations, and do not otherwise have any common management or ownership. These facts are not indicative of joint employment between *Employers A and B*.

## B. Vertical Joint Employment and Economic Dependence on the Potential Joint Employer

The vertical joint employment inquiry focuses on whether the employee of the intermediary employer is also employed by another employer – the potential joint employer. In vertical joint employment situations, the other employer typically has contracted or arranged with the intermediary employer to provide it with labor and/or perform for it some employer functions, such as hiring or payroll. There is typically an established or

Administrator's Interpretation No. 2016-1: Joint Employment Under the FLSA and MSPA - U.S. Department of Labor Ã¢‚¬â€ Wage and Hour Division (WHD)

Case 2:18-cv-01185   Document 1   Filed 08/13/18   Page 112 of 135

admitted employment relationship between the employee and the intermediary employer. That employee's work, however, is typically also for the benefit of the other employer.

In contrast to the horizontal joint employment analysis, where the focus is the relationship between the employers, the focus in vertical joint employment cases is the employee's relationship with the potential joint employer and whether that employer jointly employs the employee. Examples of situations where vertical joint employment might arise include garment workers who are directly employed by a contractor who contracted with the garment manufacturer to perform a specific function, *see Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71-72 (2d Cir. 2003); nurses placed at a hospital by staffing agencies, *see Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 143-49 (2d Cir. 2008); or warehouse workers whose labor is arranged and overseen by layers of intermediaries between the workers and the owner or operator of the warehouse facility, *see Carrillo v. Schneider Logistics Trans-Loading & Distrib., Inc.*, 2014 WL 183956, at *9-15 (C.D. Cal. Jan. 14, 2014). *See also A-One Med. Servs.*, 346 F.3d at 917; *Lantern Light*, 2015 WL 3451268, at *3 (where company has contracted for workers who are directly employed by an intermediary, court applies vertical joint employment analysis to relationship between company and workers); *Berrocal v. Moody Petrol., Inc.*, 2010 WL 1372410, at *11 n.16 (S.D. Fla. Mar. 31, 2010) (vertical joint employment may exist when "an employer hires laborers through a third party labor contractor").

A threshold question in a vertical joint employment case is whether the intermediary employer (who may simply be an individual responsible for providing labor) is actually an *employee* of the potential joint employer. Where there is vertical joint employment, there is likely a contract or other arrangement – but not necessarily an employment relationship – between the intermediary employer and the potential joint employer.[14] If the intermediary employer is an employee of the potential joint employer, then all of the intermediary employer's employees are employees of the potential joint employer too, and there is no need to conduct a vertical joint employment analysis. For example, if a farm labor contractor is not actually an independent contractor but is an employee of the grower (i.e., is economically dependent on the grower as a matter of economic reality), then all of the farm labor contractor's farmworkers are also employees of the grower. *See* 29 C.F.R. 500.20(h)(4). Likewise, if a drywall subcontractor is not actually an independent contractor but is an employee of the higher-tier contractor, then all of the drywall subcontractor's workers are also employees of the higher-tier subcontractor. In sum, it is critical to first determine whether the intermediary employer is an employee of the potential joint employer before proceeding with the vertical joint employment analysis.[15]

Once it is determined that the intermediary is not an employee, the vertical joint employment analysis should be applied to determine whether the intermediary employer's employees are also employed by the potential joint employer. Because it is an employment relationship analysis under the FLSA or MSPA, the vertical joint employment analysis must be an economic realities analysis and cannot focus only on control. As WHD has explained, the Supreme Court and the Circuit Courts of Appeals apply an economic realities analysis to determine the existence of an employment relationship under the FLSA and MSPA. *See, e.g.*, Home Care AI; Misclassification AI; *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985) (the test of employment under the FLSA is economic reality); *Goldberg v. Whitaker House Co-op, Inc.*, 366 U.S. 28, 33 (1961) (the economic realities of the worker's relationship with the employer are the test of employment); 29 C.F.R. 500.20(h)(iii). The particular economic realities factors relied upon differ somewhat depending on the court, and courts routinely note that other additional relevant factors may be considered, but regardless, it is not a control test.

The MSPA regulation, describing seven economic realities factors in the context of a farm labor contractor acting as an intermediary employer for a grower, provides useful guidance to analyze any vertical joint employment case. *See* 29 C.F.R. 500.20(h)(5)(iv). These factors are probative of the core question of whether the employee is economically dependent on the potential joint employer who, via an arrangement with the intermediary employer, is benefitting from the work. As courts have cautioned, the factors in an economic realities analysis should not be considered mechanically or in a vacuum; rather, they are guides for resolving the ultimate inquiry whether the employee is economically dependent on the potential joint employer. *See Antenor*, 88 F.3d at 932-33; Misclassification AI, 5-6.[16] Accordingly, these factors should be applied in a manner that does not lose sight of that ultimate inquiry or the expansive definition of employment under the FLSA and MSPA. See Antenor, 88 F.3d at 932-33 ("the factors are used because they are indicators of economic dependence" and should be viewed "qualitatively to assess the evidence of economic dependence"). The seven factors are:

A. **Directing, Controlling, or Supervising the Work Performed**. To the extent that the work performed by the employee is controlled or supervised by the potential joint employer beyond a reasonable degree of contract performance oversight, such control suggests that the employee is economically dependent on the potential joint employer. The potential joint employer's control can be indirect (for example, exercised through the intermediary employer) and still be sufficient to indicate economic dependence by the employee. *See Torres-Lopez*, 111 F.3d at 643 ("indirect control as well as direct control can demonstrate a joint employment relationship") (citing pre-1997 MSPA regulation); *Antenor*, 88 F.3d at 932, 934; 29 C.F.R. 500.20(h)(5)(iv). Additionally, the potential joint employer need not exercise more control than, or the same control as, the intermediary employer to exercise sufficient control to indicate economic dependence by the employee.[17]

B. **Controlling Employment Conditions.** To the extent that the potential joint employer has the power to hire or fire the employee, modify employment conditions, or determine the rate or method of pay, such control indicates that the employee is economically dependent on the potential joint employer. Again, the potential joint employer may exercise such control indirectly and need not exclusively exercise such control for there to be an indication of joint employment.

C. **Permanency and Duration of Relationship.** An indefinite, permanent, full-time, or long-term relationship by the employee with the potential joint employer suggests economic dependence. This factor should be considered in the context of the particular industry at issue. For example, if the work in the industry is by its nature seasonal, intermittent, or part-time, such industry condition should be considered when analyzing the permanency and duration of the employee's relationship with the potential joint employer.

D. **Repetitive and Rote Nature of Work.** To the extent that the employee's work for the potential joint employer is repetitive and rote, is relatively unskilled, and/or requires little or no training, those facts indicate that the employee is economically dependent on the potential joint employer.

E. **Integral to Business.** If the employee's work is an integral part of the potential joint employer's business, that fact indicates that the employee is economically dependent on the potential joint employer. Whether the work is integral to the employer's business has long been a hallmark of determining whether an employment relationship exists as a matter of economic reality. *See, e.g., Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729-30 (1947).

F. **Work Performed on Premises.** The employee's performance of the work on premises owned or controlled by the potential joint employer indicates that the employee is economically dependent on the potential joint employer. The potential joint employer's leasing as opposed to owning the premises where the work is performed is immaterial because the potential joint employer, as the lessee, controls the premises.

G. **Performing Administrative Functions Commonly Performed by Employers.** To the extent that the potential joint employer performs administrative functions for the employee, such as handling payroll, providing workers' compensation insurance, providing necessary facilities and safety equipment, housing, or transportation, or providing tools and materials required for the work, those facts indicate economic dependence by the employee on the potential joint employer.

*See* 29 C.F.R. 500.20(h)(5)(iv).

Administrator's Interpretation No. 2016-1: Joint Employment Under the FLSA and MSPA - U.S. Department of Labor Ã¢â€ Wage and Hour Division (WHD)

Case 2:18-cv-01185   Document 1   Filed 08/13/18   Page 113 of 135

Courts have applied many of the above factors to vertical joint employment scenarios in FLSA cases, though they have not explicitly relied on the MSPA regulation. *See, e.g., Carrillo v. Schneider Logistics*, 2014 WL 183956, at *6 (applying Ninth Circuit's joint employment economic realities analysis). In *Carrillo*, for example, warehouse workers sued the companies that operated the distribution warehouses and the company that owned the warehouses. The owner of the warehouses argued that it was not a joint employer of the warehouse workers. In denying the owner's motion for summary judgment, the court noted that there was evidence of possible joint employment for the following reasons: the owner exercised control over the warehouse workers' employment conditions because it approved staffing levels at the warehouse, directed that employees be shifted to an alternative workweek schedule, closely monitored productivity levels, and established various operating metrics; the work was performed on premises owned or leased by the owner, who provided all of the equipment necessary to perform work at its warehouses; the work consisted primarily of conventional manual labor, requiring little skill; and the work was an integral part of the owner's corporate strategy. *See id.* at *9-15. As the court did in *Carrillo*, applying these or similar factors will help to determine whether the employee is economically dependent on the potential joint employer.

As noted, the economic realities factors to apply vary somewhat depending on the court, but any formulation must address the "ultimate inquiry" of economic dependence. In applying any other relevant factors, the broad scope of joint employment under the FLSA and MSPA must be recognized. For example, in analyzing joint employment, the Second Circuit applies six economic realities factors: (1) use of the potential joint employer's premises and equipment for the work; (2) whether the intermediary employer has a business that can or does shift from one potential joint employer to another; (3) whether the employee performs a discrete line-job that is integral to the potential joint employer's production process; (4) whether the potential joint employer could pass responsibility for the work from one intermediary to another without material changes for the employees; (5) the potential joint employer's supervision of the employee's work; and (6) whether the employee works exclusively or predominantly for the potential joint employer. *See Zheng*, 355 F.3d at 71-72.

The Ninth Circuit applies factors from different sources: *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983) (four factor test primarily assessing potential joint employer's control of employment conditions); the pre-1997 version of the MSPA joint employment regulation; and the eight economic realities factors set forth in *Torres-Lopez*, 111 F.3d at 640-41. *See, e.g., Lantern Light*, 2015 WL 3451268, at *2-17 (applying both the *Bonnette* and *Torres-Lopez* factors and finding that satellite television provider was a joint employer of the installers employed by the company with whom the provider contracted to install its services); *Chao v. Westside Drywall, Inc.*, 709 F. Supp. 2d 1037, 1061-62 (D. Or. 2010) (applying both the *Bonnette* and *Torres-Lopez* factors). Thus, there are several formulations of the economic realities factors used to determine the employee's economic dependence on a potential joint employer that are consistent with the broad scope of employment under the FLSA.

Some courts, however, apply factors that address only or primarily the potential joint employer's *control* (power to hire and fire, supervision and control of conditions or work schedules, determination of rate and method of pay, and maintenance of employment records). *See, e.g., Baystate Alt. Staffing*, 163 F.3d at 675; *In re Enter. Rent-A-Car Wage & Hour Empl't Practices Litig.*, 683 F.3d 462, 468-69 (3d Cir. 2012). This approach is not consistent with the breadth of employment under the FLSA. "Measured against the expansive language of the FLSA," addressing only the potential joint employer's control "is unduly narrow" and "cannot be reconciled with the 'suffer or permit' language in the [FLSA], which necessarily reaches beyond traditional agency law." *Zheng*, 355 F.3d at 69. Indeed, the Second Circuit explained that, although satisfaction of the four "formal control" factors can be sufficient to establish joint employment, it has "never held 'that a positive finding on those four factors is *necessary* to establish an employment relationship.'" *Barfield*, 537 F.3d at 143 (quoting *Zheng*, 355 F.3d at 69) (emphasis in original); see also Zheng, 355 F.3d at 69 ("[T]he broad language of the FLSA, as interpreted by the Supreme Court in *Rutherford*, demands that a district court look beyond an entity's formal right to control the physical performance of another's work before declaring that the entity is not an employer under the FLSA."). As explained above, the FLSA rejected control as the standard for determining employment, and any vertical joint employment analysis must look at more than the potential joint employer's control over the employee.[18]

**Example:** A laborer is employed by ABC Drywall Company, which is an independent subcontractor on a construction project. ABC Drywall was engaged by the General Contractor to provide drywall labor for the project. ABC Drywall hired and pays the laborer. The General Contractor provides all of the training for the project. The General Contractor also provides the necessary equipment and materials, provides workers' compensation insurance, and is responsible for the health and safety of the laborer (and all of the workers on the project). The General Contractor reserves the right to remove the laborer from the project, controls the laborer's schedule, and provides assignments on site, and both ABC Drywall and the General Contractor supervise the laborer. The laborer has been continuously working on the General Contractor's construction projects, whether through ABC Drywall or another intermediary. *These facts are indicative of joint employment of the laborer by the General Contractor.*

**Example:** A worker is hired by a farm labor contractor (FLC) to pick produce on a Grower's farm. The FLC hired and pays the worker. The Grower dictates the timing of the harvest, which fields the worker should harvest, and the schedule each day. The work is unskilled, and any training is provided by the Grower. The Grower keeps track of the amount of produce that the worker picks per hour. The Grower provides the buckets for the produce, transports the produce from the field, and stores the produce. The Grower pays the FLC per bucket of produce picked, and withholds money to cover workers' compensation insurance. The worker has been continuously working on the Grower's farm during the harvest seasons, whether through this FLC or another farm labor contractor. *These facts are indicative of joint employment of the worker by the Grower.*

**Example:** A mechanic is employed by Airy AC & Heating Company. The Company has a short-term contract to test and, if necessary, replace the HVAC systems at Condor Condos. The Company hired and pays the mechanic and directs the work, including setting the mechanic's hours and timeline for completion of the project. For the duration of the project, the mechanic works at the Condos and checks in with the property manager there every morning, but the Company supervises his work. The Company provides the mechanic's benefits, including workers' compensation insurance. The Company also provides the mechanic with all the tools and materials needed to complete the project. The mechanic brings this equipment to the project site. *These facts are not indicative of joint employment of the mechanic by the Condos.*

## III. Conclusion

As a result of continual changes in the structure of workplaces, the possibility that a worker is jointly employed by two or more employers has become more common in recent years. In an effort to ensure that workers receive the protections to which they are entitled and that employers understand their legal obligations, the possibility of joint employment should be regularly considered in FLSA and MSPA cases, particularly where (1) the employee works for two employers who are associated or related in some way with respect to the employee; or (2) the employee's employer is an intermediary or otherwise provides labor to another employer.

Whether to apply a horizontal or vertical joint employment analysis (or both analyses) depends on the circumstances of the case. The focus of a horizontal joint employment analysis is the relationship and association between the two (or more) potential joint employers, and the FLSA joint employment regulation provides guidance in evaluating such cases. The focus of the vertical joint employment analysis is the relationship between the employee and the potential employer and whether an employment relationship exists between them. The analysis must determine whether, as a matter of economic reality, the employee is economically dependent on the potential joint employer. The economic realities factors in the MSPA regulation provide guidance for analyzing vertical joint employment cases, although additional or different economic realities factors that are

Administrator's Interpretation No. 2016-1: Joint Employment Under the FLSA and MSPA - U.S. Department of Labor Ã¢â€ â€ Wage and Hour Division (WHD)

Case 2:18-cv-01185   Document 1   Filed 08/13/18   Page 114 of 135

consistent with the broad scope of employment under the FLSA and MSPA may be helpful as well.

WHD will continue to consider the possibility of joint employment to ensure that all responsible employers are aware of their obligations and to ensure compliance with the FLSA and MSPA. As with all aspects of the employment relationship under the FLSA and MSPA, the expansive definition of "employ" as including "to suffer or permit to work" must be considered when determining joint employment, so as to further the statutes' remedial purposes.

---

## Footnotes

[1] For example, a corporate hotel chain may contract out to another business the management, catering, or housekeeping services at one of its hotels. Workers who perform these services at the hotel may wear uniforms with the name of the hotel chain or the other business and may perform tasks dictated by the hotel chain, the other business, or both.

[2] WHD considers joint employment in hundreds of investigations every year. WHD has determined, for example, that maritime fabrication facilities jointly employed welders, pipefitters, and other workers hired by staffing agencies; that hotels and hotel operating companies jointly employed housekeeping and guest services workers hired by staffing agencies; and that growers and farm labor contractors jointly employed farmworkers. *See also Perez v. Lantern Light Corp.*, 2015 WL 3451268, at *17 (W.D. Wash. May 29, 2015) (finding that satellite television provider was a joint employer of the installers employed by the company with whom the provider contracted to install its services).

[3] In June 2014, WHD issued Administrator's Interpretation No. 2014-2, "Joint Employment of Home Care Workers in Consumer-Directed, Medicaid-Funded Programs by Public Entities under the Fair Labor Standards Act" (Home Care AI), available at http://www.dol.gov/whd/opinion/adminIntrprtn/FLSA/2014/FLSAAI2014_2.pdf. Although the Home Care AI was directed toward a particular employment scenario in a specific industry, the legal analyses in the Home Care AI and this Administrator's Interpretation are harmonious and are intended to be read in conjunction with one another.

[4] In other words, each joint employer is individually responsible, for example, for the entire amount of wages due. If one employer cannot pay the wages because of bankruptcy or other reasons, then the other employer must pay the entire amount of wages; the law does not assign a proportional amount to each employer.

[5] In July 2015, WHD issued Administrator's Interpretation No. 2015-1, "The Application of the Fair Labor Standards Act's 'Suffer or Permit' Standard in the Identification of Employees Who Are Misclassified as Independent Contractors" (Misclassification AI), available at http://www.dol.gov/whd/workers/Misclassification/AI-2015_1.pdf. In the Misclassification AI, the Administrator also discussed the FLSA's broad statutory definitions; that AI addressed the issue of the misclassification of employees as independent contractors and provided guidance regarding determining whether a worker is an employee or independent contractor.

[6] The Department amended the MSPA joint employment regulation in 1997.

[7] Given the potential complexity of employment relationships, aspects of both horizontal and vertical joint employment may be present in a single joint employment relationship. For example, both forms of joint employment could potentially exist where two warehouses share employees and use a staffing agency to provide them with labor.

[8] Depending on the industry, the "intermediary employer" in a vertical joint employment relationship could be, for example, a staffing agency, farm labor contractor, subcontractor, or other labor provider, supplier, or broker, and the "potential joint employer" could be a parent corporation, farm owner, higher-tier contractor, or client of the staffing agency or labor provider, supplier, or broker.

Administrator's Interpretation No. 2016-1: Joint Employment Under the FLSA and MSPA - U.S. Department of Labor Ã¢â‚¬â€ Wage and Hour Division (WHD)

Case 2:18-cv-01185    Document 1    Filed 08/13/18    Page 115 of 135

[9] As discussed below, a threshold determination in those examples would be whether the subcontractor or farm labor contractor itself is an independent contractor or whether it has an employment relationship with the general contractor or grower.

[10] Courts have long turned to an economic realities analysis in analyzing vertical joint employment under the FLSA. The MSPA regulation itself cites to FLSA cases in defining joint employment. *See, e.g.,* 29 C.F.R. 500.20(h)(5)(ii) (citing *Hodgson v. Griffin & Brand of McAllen, Inc.,* 471 F.2d 235, 237 (5th Cir. 1973)).

[11] In *Layton v. DHL Express (USA), Inc.,* 686 F.3d 1172, 1176-78 (11th Cir. 2012), the court applied an economic realities analysis primarily based on the pre-1997 version of the MSPA joint employment regulation and correctly recognized that "in considering a joint-employment relationship, we must not allow common-law concepts of employment to distract our focus from economic dependency." Yet, because the case arose under the FLSA, not MSPA, the court declined to use the factors in the current MSPA joint employment regulation despite the fact that the FLSA and MSPA define the scope of employment in the same way. *See id.* at 1177 ("Although [MSPA] defines joint employment by reference to the definition provided in the FLSA, that does not mean that the reverse holds true—that joint employment under the FLSA is invariably defined by [MSPA] regulations.").

[12] Even where two establishments are sufficiently related that they are part of a single enterprise (as defined in 29 U.S.C. 203(r)(1)) for FLSA coverage purposes, a separate determination is necessary to determine whether the establishments are joint employers. *See* 29 C.F.R. 779.203; *A-One Med. Servs.,* 346 F.3d at 917 ("Whether two companies constitute a single enterprise for FLSA coverage and whether they are liable as joint employers . . . are technically separate issues."). As explained by the case law, although the two analyses may require similar fact-finding and have similar considerations, determining that an employer is part of an enterprise to ascertain coverage under the FLSA is different from determining that the employer is a joint employer that is liable for minimum wages and overtime. *See, e.g., Patel v. Wargo,* 803 F.2d 632, 635 (11th Cir. 1986).

[13] The addition or alteration of any of the facts in any of the examples in this AI could change the resulting analysis.

[14] The contract between the potential joint employer and the intermediary employer may purport to disclaim or deny any responsibility by the potential joint employer as an employer. However, that type of contractual provision is not relevant to the economic realities of the working relationship between the potential joint employer and the employee.

[15] The intermediary employer will be either an independent contractor or employee of the potential joint employer under the FLSA or MSPA. The Misclassification AI discusses the analysis for determining whether a worker is an employee or independent contractor. *See also* 29 C.F.R. 500.20(h)(4).

[16] The vertical joint employment economic realities factors overlap some with the economic realities factors used to determine whether a worker is an employee or an independent contractor, as discussed in the Misclassification AI. However, the exact factors applicable when determining whether a worker is an employee or an independent contractor cannot apply in a vertical joint employment case because they focus on the possibility that the worker is in business for him or herself (and thus is an independent contractor). In a vertical joint employment case, the worker is not in business for him or herself, but is an employee of the intermediary employer, and may also be employed by the potential joint employer.

[17] This point holds true for the vertical joint employment analysis in general. It is not necessary for the employee to be more economically dependent on the potential joint employer than the intermediary employer for there to be joint employment. *See Antenor,* 88 F.3d at 932-33. The focus is the employee's relationship with the potential joint employer and not a comparison of that relationship with the employee's relationship with the intermediary employer. *See id.*

[18] *Enterprise Rent-A-Car* involved whether a parent company was a joint employer of its subsidiaries' employees. *See* 683 F.3d at 464. The Third Circuit acknowledged the breadth of employment under the FLSA and that indirect control can show joint employment, but it nonetheless ruled that joint employment in that case was determined by whether the parent exercised significant control. *See id.* at 467-68. The Third Circuit recognized that the control factors "*do not constitute an exhaustive list* of all potential relevant facts" and should not be blindly applied; rather, a joint employment determination must consider the employment situation in totality, including the economic realities of the working relationship. *Id.* at 469 (emphasis in original). The Third Circuit seemed to leave open the possibility that, in a case involving an intermediary employer providing labor to

Administrator's Interpretation No. 2016-1: Joint Employment Under the FLSA and MSPA - U.S. Department of Labor Ã¢â€ Wage and Hour Division (WHD)

Case 2:18-cv-01185   Document 1   Filed 08/13/18   Page 116 of 135

another employer, it would consider applying economic realities factors beyond the control factors applied in *Enterprise Rent-A-Car* to determine whether that other employer is a joint employer.

**Freedom of Information Act  |  Privacy & Security Statement  |  Disclaimers  |  Important Web Site Notices  |  Plug-ins Used by DOL**

U.S. Department of Labor | Frances Perkins Building, 200 Constitution Ave., NW, Washington, DC 20210
www.dol.gov | Telephone: 1-866-4-USWAGE (1-866-487-9243) | TTY | Contact Us

**EXHIBIT 11**



---------- Forwarded message ----------
From: **Della Millring** <dmillring@rrtusa.com>
Date: Tue, Jul 3, 2018 at 12:42 PM
Subject: Logging in on time
To: RRT Servers <servers@rrtusa.com>, Queue Managers <quemanagers@rrtusa.com>

Team it is imperative that you log in on time for your shift that means if you are scheduled for 9am you should be in the que and ready to take calls at 9am this impact our calls when your not on time





**Della Millring**
OPERATIONS SUPERVISOR
RESTAURANT REVOLUTION TECHNOLOGIES, INC.

**M** (385)237-8076    **E** dmillring@ rrtusa.com
**W** www.rrtusa.com

*The Off-Premise Partner for Restaurants*

--



**Virginia Farley**
*VIRTUAL SERVER*

M  321.696.1620
E  **Vfarley@rrtusa.com**

**RESTAURANT REVOLUTION TECHNOLOGIES, INC**
*The Off-Premise Partner for Restaurants*

**EXHIBIT 12**



---------- Forwarded message ---------
From: Kelly Tep <ktep@rrtusa.com>
Date: Tue, Jun 5, 2018, 11:14 AM
Subject: Make sure to run CC Cleaner before your shift today.
To: RRT Servers <servers@rrtusa.com>


Thank you!



**Kelly Tep**
**HIRING & DEVELOPMENT LIAISON**
**RESTAURANT REVOLUTION TECHNOLOGIES, INC.**

**M** (209) 276-1032   **E** ktep@rrtusa.com
**W** www.rrtusa.com **S** HappyKellyRRT

*The Off-Premise Partner for Restaurant*

**EXHIBIT 13**



---------- Forwarded message ---------
From: Brianna Torres <btorres@rrtusa.com>
Date: Fri, Dec 15, 2017, 12:55 PM
Subject: ACTION ITEM: ALL SERVERS
To:
Cc: Alex Lin <alin@rrtusa.com>, Brandon Smith <bsmith@rrtusa.com>, Stacey Raus
<sraus@rrtusa.com>, Kelly Tep <ktep@rrtusa.com>

## Hi Team,

We are officially rolling out Paperspace to ALL agents! This will now be **mandatory** for all users taking calls for PCI Compliance. For those not currently using Paperspace or on the correct download please reach out with a good time and day to get you set up. We will be reaching out to you individually as well.

I look forward to hearing from you all! You can reach out to me via email or skype.
We will connect via screenconnect & Skype.

**When running the Paperspace application. Please make sure that;**

1. Bria "OR" Accession is open on your main desktop first (Outside of Paperspace)
2. You are logged out of Telax on your main desktop before starting the Paperspace application.

Once the application is open, login normally; just make sure you use the "Sign in with domain" button.

Username will be the same as your CRM & Telax Usernames (first initial last name all lowercase, ex. btorres).

Domain is rrt01.lan (Lowercase L).

Passwords will be provided, they are case sensitive and will be similar to this. (RRTUser##).


Please report any issues to Alex, cc quemanagers@rrtusa.com & techsuppot@rrtusa.com




**Brianna Torres**
**SUBJECT MATTER EXPERT- TECH SUPPORT**
**RESTAURANT REVOLUTION TECHNOLOGIES, INC.**

**W** (442) 325-0534    **S briannatorres1120**
**W** www.rrtusa.com

*The Off-Premise Partner for Restaurant*

**EXHIBIT 14**



---------- Forwarded message ---------
From: Mary Nasca <mnasca@rrtusa.com>
Date: Thu, Jan 5, 2017, 12:03 AM
Subject: Re: TECH ISSUES.....PLEASE RESPOND WITH UNDERSTOOD!!
To: Raven Clark <rclark@rrtusa.com>
Cc: Laura May <lmay@rrtusa.com>, RRT Servers <servers@rrtusa.com>


Understood

On Wed, Jan 4, 2017 at 10:41 PM, Raven Clark <rclark@rrtusa.com> wrote:
> Understood

On Jan 4, 2017 6:25 PM, "Melody Carswell" <mcarswell@rrtusa.com> wrote:
> understood
>
> *Thank you and have a fabulous day,*
> **Melody Carswell**
> **Virtual Server**
> 
> _____
>
> Mobile:  *(912)850-8780*
> Email:  *mcarswell@rrtusa.com*
> Skype: Melody.Carswell
> Website:  *www.rrtusa.com*
>
> On Wed, Jan 4, 2017 at 1:05 PM, Laura May <lmay@rrtusa.com> wrote:
>> Quemanagers@rrtusa.com
>> Techsupport@rrtusa.com
>> Ckunzler-lahey@rrtusa.com
>> Any tech related issues.
>> Please use technical issue template when reporting any tech issues. This format is in daily updates email.
>> IF YOU ARE HAVING TECH RELATED ISSUES, YOU MUST FOLLOW THESE STEPS. IF YOU DO NOT FOLLOW THESE STEPS AND YOU ARE IN TECH ISSUES, WE WILL ASSUME YOU DO NOT HAVE A TECH RELATED PROBLEM AND LOG YOU OUT!!!!!
>> ALSO, PLEASE LET A QM KNOW IF YOU ARE FOLLOWING THESE STEPS...
>>
>> --
>> **Thank you,**

**Laura May**

**Operations Supervisor**

Cell #: (702)283-4206

Email: lmay@rrtusa.com

*"Beyond Takeout"*

rrtusa.com

--
Mary Nasca
Virtual Server


Mobile: (727) 777-1627
Email: mnasca@rrtusa.com
Website: www.rrtusa.com

# EXHIBIT 15



---------- Forwarded message ----------
From: **Kelly Tep** <ktep@rrtusa.com>
Date: Monday, June 26, 2017
Subject: Cookie Cleaner Download.
To: RRT Servers <servers@rrtusa.com>

# CCLEANER INSTRUCTIONS



## How to use these files:

- **Clean Only** – Use this during your breaks and/or whenever the CRM or your softphone is acting weird. The script prompt you for permission to run then will shut down **ALL** your browser and CRM windows then clean your cache.

- **Clean and Reboot** – Use this during your breaks and/or whenever the CRM has completely frozen. Use this if Clean Only does not seem to fix the issue. The script prompt you for permission to run then will run the same process as Clean Only and reboot your machine within 5 minutes. A notification will pop up telling you your computer will be rebooting.

- **Clean and Shutdown** – Use this when you are done with your shift or shutting down your machine. The script prompt you for permission to run then will Clean and then shutdown your machine for you.

## Download APP  & script file Links:

- **CCleaner  link to download it:**
  **https://www.piriform.com/ ccleaner/download/standard.**

**The installation is straightforward, you should not need to make any changes to the default installation rules. Note: If you do not have Google Chrome installed it may ask you if you want to install it with CCleaner. It is not required for the install and you can uncheck it if you like however it is not detrimental in anyway.**

*Kelly Tep*
*Hiring & Development Liaison*

Mobile:  *(209)-276-1032*
Skype:  *HappyKellyRRT*
Website:  *www.rrtusa.com*

*Beyond Takeout*

--
Virginia Farley

**EXHIBIT 16**



---------- Forwarded message ----------
From: **Stacey Raus** <sraus@rrtusa.com>
Date: Tue, Apr 24, 2018 at 11:16 PM
Subject: CHECKING THE SCHEDULE
To: Queue Managers <quemanagers@rrtusa.com>


It is 100% your responsibility to check the schedule on a daily basis.

We have had numerous Servers missing time because they just assume they are not working on a given day.  To be clear - we are not adding random hours throughout the week, but you must check the schedule.

Please and thank you.




### Stacey Raus
**VICE PRESIDENT OF OPERATIONS**
**RESTAURANT REVOLUTION TECHNOLOGIES, INC.**

**M** (319) 210-7810     **E** sraus@rrtusa.com
**W** www.rrtusa.com

*The Off-Premise Partner for Restaurants*


--



### Virginia Farley
*VIRTUAL SERVER*

**M** 321.696.1620
**E** Vfarley@rrtusa.com

**RESTAURANT REVOLUTION TECHNOLOGIES, INC**
*The Off-Premise Partner for Restaurants*

**EXHIBIT 17**



---------- Forwarded message ---------
From: Stacey Raus <sraus@rrtusa.com>
Date: Sun, Apr 15, 2018, 5:36 PM
Subject: Re: RRT ANNOUNCES BONUS PLAN!!!
To: Supervisor Team <sups@rrtusa.com>

Good morning - today marks the end of the 90 day trial period for the Bonus that started on January 15th.  We will have paid out almost $20,000 in that time!!!  Many servers are earning $.75 to over $1.00 per hour more with this bonus.

During this 90 days, we have received many ideas or potential changes from many of you in order to make the bonus more fair or to make it better in the best interest of the company/customers.  Our goal is to reward the best servers and to drive quality and efficiency higher.

**WE WILL BE PAYING OUT THE BONUS FROM APRIL 1 to APRIL 15 ON THIS FRIDAY'S PAY CHECK!!!!**

**THE NEW BONUS PROGRAM, OUTLINED BELOW, WILL START ON MAY 1, 2018 AND WILL BE PAID OUT MONTHLY (AS IT HAS BEEN).  Bonus remains at 10 cents per order.**

**Since we are re-booting the bonus plan on 5/1/18, we will run some different contests over this next two weeks so servers will have a chance to make some extra money.**

Below are the updated guidelines for the bonus plan.

1. One key change based on your feedback is any server who takes over 1000 orders a month will get 2 free errors versus one - that is a huge change..  Meaning, once you hit your 3rd error, your bonus will be reduced to 50%.  If you take 999 orders or less, you only get one error before there is a reduction in bonus pay out.   We have reduced the secondary payout from 75% to 50% - this is effort to put more emphasis on quality - it is #1.

2. Other key change - if ANY call is escalated to us or we find a call related to rudeness or background noise issues - that is an automatic removal from any bonus that month.  Rudeness will NEVER be tolerated.  Background noise issues jeopardize our contracts as well.

3. We have added wrap time as a qualifier as well (except in your first 60 days with RRT).  This is a key metric that most of you are already hitting but this metric is a key driver in efficiency.

4. You must be active at the time of payout - no change there.

5. We can alter this plan at anytime.  We will review again in 60 days.

6. If you get a "-1" from QA, that counts as an error (just like it does currently).  So please make sure you are reviewing those scores.

7. We have also added a shift swap element.  This is to drive attendance and this policy already exists.  We just added it to the bonus.  No more than 4 in a month.  Better attendance is a key driver moving forward.

8. We will use the CRM data to confirm orders (no change there)

Please email me only with questions.

| FOR SERVERS WHO TAKE 1000 ORDERS A MONTH OR LESS | | |
|---|---|---|
| **MUST MEET ALL THESE TO HIT 100%** | **To Achieve 50%** | **No Bonus Qualifiers** |
| <=4 Shift Swaps in the month | <=4 Shift Swaps in the month | >= 5 swaps |
| Active at the time of payout | Active at the time of payout | Not active at the time of payout |
| Wrap of <=17 seconds | Wrap of 18-21 seconds | Wrap of >= 22 seconds (except in 1st 60 days) |
| 1 or fewer errors/escalations/-1 Qa's | 2 errors/escalations/-1 Qa's | >=3 errors/ escalations/-1 Qa's |
| Zero background noise issues | Zero background noise issues | Any background noise issues |
| Zero rudeness/shortness issues | Zero rudeness/shortness issues | Any rudeness/shortness issues |

| FOR SERVERS WHO TAKE 1000 ORDERS A MONTH OR MORE | | |
|---|---|---|
| **MUST MEET ALL THESE TO HIT 100%** | **To Achieve 50%** | **No Bonus Qualifiers** |
| <=4 Shift Swaps in the month | <=4 Shift Swaps in the month | >= 5 swaps |
| Active at the time of payout | Active at the time of payout | Not active at the time of payout |

| Wrap of <=17 seconds | Wrap of 18-21 seconds | Wrap of >= 22 seconds (except in 1st 60 days) |
|---|---|---|
| 2 or fewer errors/escalations/-1 Qa's | 3 errors/escalations/-1 Qa's | >=4 errors/ escalations/-1 Qa's |
| Zero background noise issues | Zero background noise issues | Any background noise issues |
| Zero rudeness/shortness issues | Zero rudeness/shortness issues | Any rudeness/shortness issues |



**Stacey Raus**
VICE PRESIDENT OF OPERATIONS
RESTAURANT REVOLUTION TECHNOLOGIES, INC.

M  (319) 210-7810    E  sraus@rrtusa.com
W  www.rrtusa.com

*The Off-Premise Partner for Restaurants*

On Wed, Jan 17, 2018 at 9:15 AM, Stacey Raus <sraus@rrtusa.com> wrote:
We are very excited to announce that as of January 15th, 2018 there will be a bonus plan available to all Servers, SME's and Supervisor's.  This is an opportunity to make extra money on every order that is placed.  Here are the details:

- For each successful voice order that is placed (does not include fails, cancels or voids), the server will receive 10 cents

- On average this means each server will earn anywhere from an extra 50 cents per hour to over a dollar an hour in some cases.  As an example, many FULL TIME servers will get $120-$180 (or more) extra per month.

- Those who work fewer hours will still average around $.50 to $1/hour extra on average - just like the FT - it is all about turning calls into orders

- This bonus will be paid monthly meaning the January 15-31 bonus will be paid on the second paycheck in February.  February 1-28th will be paid in March (second week's paycheck).......

- YOU MUST BE AN ACTIVE EMPLOYEE AT THE TIME OF PAY OUT

- This is a 90 day trial from 1/15/18 to 4/15/18 (we reserve the right to make changes during this time but do not anticipate needing to)

- After the 90 days we will review and make any changes based on feedback and results, our intent is to keep this plan long term (with possible tweaks here and there)

- We will be using the official CRM/OM database to determine orders (any order that fails or are voided do not count in the total).

QUALITY COMPONENT:

- We will continue to stress quality but we realize some mistakes do happen:

- If our quality team finds an error in an order (which includes ANY -1 scored calls), or the Client/Guest raises a concern about an order and it is clear a mistake was made, the payout rules will change for that Server
- Errors also include rudeness, shortness or rushed calls as well (remember FRIENDLY / ACCURATE / ENERGETIC / RESOLUTION)
- If you make one mistake (as noted above) in a month, there is no penalty
- If you make two mistakes, your bonus will be reduced to 75% of the payout
- If you make three or more mistakes in a month, your will forfeit your entire bonus

This has been something everyone has asked for and we are very happy to get this going - effective immediately!!!

If you have any questions - please REPLY TO ME ONLY - if there are common questions, I will send those out to the entire team.



**Stacey Raus**
VICE PRESIDENT OF OPERATIONS
RESTAURANT REVOLUTION TECHNOLOGIES, INC.

M  (319) 210-7810    E  sraus@rrtusa.com
W  www.rrtusa.com

*The Off-Premise Partner for Restaurants*